COMMONWEALTH *vs.* ROBERT BATCHELDER.

Essex. May 7, 1990. - June 27, 1990.

Present: LIACOS, C.J., NOLAN, O'CONNOR, & GREANEY, JJ.

*Homicide. Insanity. Malice. Practice, Criminal*, Instructions to jury.

At the trial of indictments for murder, the judge's instructions to the jury,
which erroneously failed to apprise the jury that proof of murder in the
second degree requires proof of malice, created a substantial risk of a
miscarriage of justice inasmuch as the error complained of occasioned
the possibility that the jury returned verdicts of guilty of murder in the
second degree even though finding that, due to his mental impairment,
the defendant did not act with malice. [757-760]

INDICTMENTS found and returned in the Superior Court
Department on August 27, 1986.

The cases were tried before *Peter F. Brady*, J.

The Supreme Judicial Court granted a request for direct
appellate review.

*Carol A. Donovan*, Committee for Public Counsel Ser-
vices, for the defendant.

*Robert J. Bender*, Assistant District Attorney, for the
Commonwealth.

NOLAN, J. On August 27, 1986, an Essex County grand
jury returned two indictments for murder against the defend-
ant, Robert Batchelder. On April 17, 1988, a jury convicted
the defendant of murder in the second degree on both indict-
ments. The defendant was sentenced to consecutive terms of
life imprisonment. The defendant appealed and we granted
his application for direct appellate review.

We briefly summarize the evidence introduced at trial. On
July 2, 1986, the two victims were asleep in one of the first-
floor apartments at 91 Summer Street in Lawrence. At about

4 A.M., the defendant, who lived upstairs, broke in the front door of the apartment and stabbed both women to death.

At 10:50 A.M. on July 3, 1986, about thirty hours after the murders, two officers of the Pittsburgh, Pennsylvania, police department were dispatched to North Shore Drive at Three Rivers Stadium in Pittsburgh regarding a report of "a man struck by a car." The officers found a city fire fighter there attending to the defendant, who was lying at the edge of the roadway. The fire fighter, while involved in "training maneuvers" in the stadium parking lot, had witnessed "the accident." The fire fighter reported that the defendant told him that he "tried to commit suicide and failed again, [that he was] a murderer and [did not] deserve to live." One officer heard the defendant say that he "killed those girls and wanted to kill [himself]."

The defendant was then transported to a hospital's emergency room and treated. Two Pittsburgh homicide detectives confirmed with the Massachusetts State police that two murders had occurred as the defendant had stated. They conferred with a doctor in the emergency room and then interviewed the defendant.

The interview with the Pittsburgh detectives continued for one-half to three quarters of an hour. The defendant began by stating that he was a Marine Corps veteran from Lawrence. He said that he had been working at Ayer Sales in Reading where three fellow employees, Janet Mazzola, Karen McCarthy, and Anne Marie Blackburn, "were conspiring against him to ruin his sex life, to ruin his reputation at work, and [that] he was being physically run down because of this." The defendant explained that "he knew the two victims just from seeing them but he later learned they also started to conspire against him along with these three girls from his work place" after he moved to Lawrence.

The Pittsburgh detectives asked "how this incident occurred." The defendant responded that, during the day, he purchased a hunting knife at K-Mart "for the purpose of killing the victims and also for protection from others that he believed to be out to do him harm." That night "he was in

his apartment and he heard somebody outside tampering with his car, and when he looked out the window he seen [*sic*] two males tampering with his car. . . . He decided at that time to put a stop to his troubles and he got the knife and went downstairs to the victims' apartment and killed them by stabbing them repeatedly."

The defendant claimed that next he ran two miles to a bus stop. The defendant stated he was "covered with blood and . . . that he knew he had killed the girls and that he never went back to the building for that reason." When asked what became of the clothing and the knife that he had that night, the defendant responded that he had thrown them into a trash bin somewhere in the area. When asked how his mental state was that night, the defendant stated that "it had to be done and that he had no drugs or booze." The defendant stated that he had taken a bus to Pittsburgh. When asked about his automobile, the defendant explained that he wrecked his automobile either before or after the murders. The defendant stated that his last girl friend, one Linda Harper, was aware of the problems he was having and of who was responsible for those problems. When asked to elaborate as to why the incident took place, the defendant replied that, "[i]t could be explained very simply. That the victims had caused him trouble with his girl, his job, and then with his auto, and there was no reason for him to live. So, if he was going to go, so were they."

Later that day, the Pittsburgh detectives met with a Massachusetts State police sergeant as well as a sergeant of the Lawrence police department. The next morning, July 4, 1986, the defendant gave a statement to these two officers from Massachusetts and to a Pittsburgh police detective. This statement was consistent with the defendant's earlier interview with the Pittsburgh detectives.

On July 14, 1986, the defendant appeared in the Lawrence Division of the District Court Department where it was ordered that he be committed to Bridgewater State Hospital for observation. Dr. Albert D. Pike, a psychiatrist employed by Bridgewater State Hospital to evaluate defendants for

competency and criminal responsibility, evaluated the defendant at the request of the court. Dr. Pike's report stated that, in his opinion, the defendant was competent to stand trial but was not criminally responsible for the homicides. On November 13, 1986, the defendant filed a notice of intent to rely on the insanity defense and to call Dr. Pike as a witness. The Commonwealth filed a motion for psychiatric examination of the defendant on December 5, 1986. The motion was continued to December 30 for hearing. In early November, 1986, the prosecutor communicated with Dr. Martin Kelly, a forensic psychiatrist, relative to the defendant's insanity defense. Apparently due to a miscommunication between the prosecutor and Dr. Kelly, Dr. Kelly examined the defendant on December 15, 1986, although no such examination had been ordered as of that date by the court. Upon learning what had occurred, the prosecutor notified defense counsel. On February 4, 1987, the defendant filed a motion to dismiss based on Dr. Kelly's action. The defendant also requested funds to retain Dr. Kelly. The judge denied the motion to dismiss but allowed the motion for funds. On May 15, 1987, the judge allowed the Commonwealth's motion, filed on December 5, 1986, for a psychiatric examination of the defendant. The defendant's petition for relief from this order was denied. Pursuant to the May 15, 1987, order, Dr. Robert M. Weiner examined the defendant on November 2, 1987. Meanwhile, the defendant was examined by Dr. David Swenson, a psychiatrist employed by the Commonwealth to service the Essex County courts, at the defendant's request.

Two of the three women from Ayer Sales whom the defendant had mentioned to the police testified. Janet Mazzola denied ever calling the defendant, visiting his apartment, or knowing the victims. She believed the defendant was angry toward her and others, that he "had some kind of chip on his shoulder," "[a]gainst everybody." She said that the defendant had accused her of spreading rumors about him, once had thrown a box at her, and once had struck her automobile with his automobile in the company parking lot, but he denied having done it. Karen McCarthy, another of the "three

girls" at Ayer Sales, testified that she did not know the defendant had moved to Lawrence, and did not know the two victims. She did not recall any "trouble" in her contact with the defendant. She said she had never called the defendant, had never gone to his house or his mother's house and had never spoken to anyone about killing him.

The defense introduced expert testimony on the issue of the defendant's criminal responsibility. Dr. Pike testified that he believed the defendant suffered from a paranoid disorder with its major symptom being his delusion or false beliefs. It was his opinion that the defendant understood and appreciated the criminality of his acts, but that he lacked substantial capacity to conform his conduct to the requirements of law.

Dr. Martin Kelly, associate director of psychiatry at Brigham and Women's Hospital, with whom the prosecutor had communicated with respect to examining the defendant, also testified. After examining records sent to him by the prosecutor, including the grand jury minutes, hospital and police records, and witness statements, he interviewed the defendant. As a result of this examination, Dr. Kelly concluded that at the time of the homicides, the defendant suffered from a psychotic delusional illness, which he would characterize as a paranoid psychosis or paranoid schizophrenia. In Dr. Kelly's opinion, this illness deprived the defendant of the substantial capacity to conform his conduct to the requirements of the law.

Dr. David Swenson examined the defendant at the request of defense counsel. In Dr. Swenson's opinion, the defendant was psychotic both at the time of the offenses and at the time of the examination. Dr. Swenson concluded that the defendant had been in a "psychotic rage" when he broke into the victims' apartment. According to Dr. Swenson, it was "possible that [the defendant] at the exact time of the stabbings lacked the capacity to appreciate the criminal aspect," and that "it appeared" the defendant lacked substantial capacity to conform his conduct to the requirements of the law.

Dr. Robert M. Weiner, who examined the defendant at the request of the prosecution, opined that the defendant understood the wrongfulness of his acts, as evidenced by his subsequent flight and by his knowledge that the police would be involved. It was also his opinion that the defendant had a substantial capacity to conform his conduct to the requirements of the law.

On appeal, the defendant claims that the judge failed to instruct adequately on murder in the second degree and that the judge erred in failing to instruct on manslaughter. We address the adequacy of the judge's instructions on murder in the second degree. We set out the relevant portions of the judge's charge in the margin.[1]

---

[1]The judge gave the following instruction: "In murder in the first degree the Commonwealth must prove beyond a reasonable doubt the act of an unlawful killing and that the killing was committed with deliberately premeditated malice aforethought or, in this particular case or cases, with extreme atrocity or cruelty. By saying to you those things it probably now is clearer to you that the government, the Commonwealth, has proceeded in this trial under two distinct and permissible theories of first degree murder. One, deliberately premeditated malice aforethought. And the second theory being with extreme atrocity or cruelty.

"A killing is unlawful if it is done without justification or excuse. Now, a soldier in a war is justified in a killing; and a very young child can be excused in the death caused by the discharging of a gun.

"I am separately going to explain, as I am required to do, the different theories upon which the Commonwealth has tried its case.

"The first theory is of deliberately premeditated malice aforethought. Malice: In this case, if you find the defendant intended to kill the victim or intended to inflict grievous bodily harm, both intentions arising before the killing, then that would be sufficient for you to find malice aforethought. Not to emphasize but just to make it clear to you, I shall repeat that. Malice: In this case, if you find the defendant intended to kill the victim or intended to inflict grievous bodily harm, both intentions arising before the killing, then that would be sufficient for you to find malice aforethought.

"In that definition I used the word intent. Specific intent is required in this crime. Specific intent involves a concentrating or focusing of the mind. It is contemplation rather than reflection and must precede the act.

"Just to help you understand, although you probably well understand specific intent, there are other crimes in our Commonwealth which are general-intent crimes. General intent is when, for example, we stand or sit down. The mind, of course, works to decide whether to stand or to sit

After instructing the jury on murder in the first degree and on murder in the second degree and on criminal responsibility, the judge continued with an instruction pursuant to *Commonwealth* v. *Gould*, 380 Mass. 672 (1980). Within the *Gould* instruction, the judge stated: "In simpler language, that means if you find that there was deliberately premeditated murder, and this deliberately premeditated murder was accompanied with that *malice aforethought which I have explained to you was an integral part of murder . . . .*"

The defendant contends, for the first time on appeal, that the judge's definition of murder in the second degree was fatally defective in that it failed to apprise the jury that proof of murder in the second degree requires proof of malice. The defendant also contends that the judge's instructions were in error because they implied that murder in the first degree, but not murder in the second degree, is a specific intent crime.[2] The defendant asserts that the judge's erroneous instruction was significant because there was evidence tending

---

down, but there is no focusing or concentration of the mind. They are reflection actions.

"As I have said, in this particular crime, first degree murder, it is specific intent that is required. Therefore, contemplation rather than reflex action preceding the act."

After defining deliberate premeditation and extreme atrocity or cruelty, the judge stated: "That is, my friends, the explanation of first degree murder upon which the government has proceeded during the trial.

"In this particular case I instruct you that you are also legally permitted to return a verdict of second degree murder.

"Under our statutory law defining murder there appears the following definition: Murder which does not appear to be in the first degree is murder in the second degree. The degree of murder shall be found by the jury. Let me repeat that statutory language. Murder which does not appear to be in the first degree is murder in the second degree. The degree of murder shall be found by the jury."

[2]The judge's definition of malice aforethought was more favorable to the defendant than the law requires. The defendant asserts that the judge's instructions implied that murder in the first degree, but not murder in the second degree, is a specific intent crime. However, because malice aforethought may be found in the absence of a specific intent to kill or to inflict grievous bodily harm, murder in the second degree cannot be said to require specific intent. See *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987); *Commonwealth* v. *Starling*, 382 Mass. 423, 428 (1981).

to show that, because of his mental condition, the defendant may not have acted with malice when he killed the victims.

Because the defendant's counsel did not object to the judge's instructions on the elements of murder in the second degree, we must ascertain whether the instructions were so seriously flawed as to create a substantial risk of a miscarriage of justice. *Commonwealth v. Lennon,* 399 Mass. 443, 448-449 n.6 (1987). The defendant argues that the judge's instructions created the possibility that the jury returned verdicts of guilty of murder in the second degree even though finding that, due to his mental impairment, the defendant did not act with malice. We conclude that the judge's instructions may have created such a risk.

A trial judge has the duty to state the applicable law clearly and correctly. *Commonwealth v. Corcione,* 364 Mass. 611, 618 (1974). In assessing the sufficiency of the jury instructions, we consider the charge in its entirety, to determine the "probable impact, appraised realistically . . . upon the jury's factfinding function." *Commonwealth v. Richards,* 384 Mass. 396, 399-400 (1981), quoting *United States v. Wharton,* 433 F.2d 451, 457 (D.C. Cir. 1970). "[W]hether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction[s]." *Commonwealth v. Nieves,* 394 Mass. 355, 360 (1985), quoting *Sandstrom v. Montana,* 442 U.S. 510, 514 (1979).

The Commonwealth contends that the judge's instructions, taken as a whole, were sufficient to inform the jury that proof of murder in the second degree requires proof of malice. The Commonwealth alerts our attention to the judge's *Gould* instruction where the judge directed the jury to consider whether "mental impairment of the defendant's mental process precluded him from being able to deliberately premeditate" and "whether or not the defendant committed the murder with extreme atrocity or cruelty." This, the Commonwealth contends, identified for the jury the very elements which distinguished murder in the first degree from murder in the second degree, because the judge then explained: "If

you find that he was so mentally impaired on the date of the alleged crime, that would not require a finding of not guilty, but it would reduce both theories of first degree murder . . . to second degree murder." The Commonwealth also points to the judge's statement within the *Gould* instruction "that malice aforethought . . . was an integral part of murder."

In charging the jury on murder in the second degree, the judge erred in failing to delineate more clearly the elements of murder in the second degree. We cannot say with confidence that a reasonable juror would have understood, from the judge's instructions, that a conviction of murder in the second degree requires proof of malice. Hence, the judge's instructions created a substantial risk of a miscarriage of justice.

Accordingly, the judgments are reversed, the verdicts set aside, and the cases are remanded for a new trial.[3]

*So ordered.*

---

[3]Because we reverse on this ground we need not address the defendant's remaining contentions. We pause to note that the defendant has been "implicitly acquitted" of the portion of the indictments charging murder in the first degree and, therefore, cannot be retried as to those offenses. See *Price* v. *Georgia*, 398 U.S. 323, 328-329 (1970); *Green* v. *United States*, 355 U.S. 184, 190-191 (1957).