**Jonathan C. SHAW, Petitioner–Appellant,**

v.

**Cal TERHUNE, Respondent–Appellee.**

No. 02–16829.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 13, 2003.

Filed Dec. 22, 2003.

Suzanne A. Luban, Oakland, CA, for the appellant.

Christopher W. Grove, Deputy Attorney General, San Francisco, CA, for the appellee.

Before WALLACE, HALL, and O'SCANNLAIN, Circuit Judges.

## ORDER AND AMENDED OPINION

### ORDER

The opinion filed December 22, 2003, is hereby amended and the dissent shall be withdrawn. The Clerk shall file the attached amended opinion.

With the filing of this opinion, the panel has voted to deny appellant's petition for panel rehearing. Judge O'Scannlain has voted to deny the petition for rehearing en banc and Judges Wallace and Hall have recommended denial. The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are DENIED.

### OPINION

HALL, Senior Circuit Judge.

Jonathan Shaw appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. Shaw was convicted in a California state court on multiple counts of assault, robbery, and attempted robbery in connection with an armed robbery of a Lyon's restaurant. Shaw was sentenced to 136 months in prison, which included a sentence enhancement imposed for "personal use" of a firearm during the assault and attempted robbery of Cheryl Bishop.[1] More than two years after Shaw's conviction, his accomplice in the armed robbery, Mango Watts, was convicted on the same counts. Watts's sentence also included a "personal use" enhancement. Shaw asserts that his due process rights were violated at the two trials by the state prosecutor's advancement of factually inconsistent arguments, which precipitated inconsistent jury verdicts. His habeas petition was denied by the district court on August 5, 2002.

---

1. *See* CAL PENAL CODE § 12022.5(a) ("[A]ny person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years ....").

We have jurisdiction pursuant to 28 U.S.C. § 1291. We do not reach the primary issue raised by Shaw's habeas petition because we conclude that even if the prosecutor's espousal of factually inconsistent positions would violate due process, there was sufficient evidence upon which the jury could convict Shaw without implicating the factual tension, thereby rendering the error harmless. Accordingly, we now AFFIRM the denial of Shaw's petition for a writ of habeas corpus.

## I.

On December 13, 1995, Shaw was convicted of multiple counts of assault, robbery, and attempted robbery stemming from the September 3, 1995, armed robbery of a Lyon's restaurant. On March 30, 1998, one of Shaw's accomplices in the armed robbery, Mango Watts, was convicted on multiple counts of assault, robbery, and attempted robbery in connection with the same incident.

### A. *Shaw's Trial*

At the trial of Jonathan Shaw, the prosecution offered the testimony of several witnesses to support the contention that Shaw had used a firearm during the commission of the attempted robbery and assault of Bishop, the manager of the Lyon's restaurant.

Michelle Jackson testified that while she and her friend, Dawn McGhie, were waiting to be served, they saw a hooded man, whom Jackson recognized as an acquaintance named "Bob," demand money from the bartender at gunpoint. When "Bob" turned and saw Jackson and McGhie, perhaps wary of having been recognized, he shouted "let's get out of here." Immediately thereafter, Jackson saw another man, whom she recognized as Shaw, exiting the kitchen area brandishing a gun. A few moments later, Jackson observed Watts running from the same direction.

Dawn McGhie, Jackson's dinner companion, testified that she witnessed many of the same events as Jackson. She recalled identifying Shaw as the first man running from the kitchen after hearing Jackson exclaim, "Oh, my God, that's [Shaw]." She also recalled seeing a second individual exit the kitchen shortly thereafter.

Eva Birrueta, a hostess at Lyon's restaurant, testified that, while working at the front cash register, one of the hooded men struck her on the head with a gun. She also observed one of the men hit her co-worker, Sonia Marin, but was unable to identify conclusively the person responsible for either transgression.

Sonia Marin testified that she was waiting tables the night of the robbery. She was assaulted by one of the hooded men, who struck her on the right side of her head with a gun, then forced her to lead him to Cheryl Bishop, the manager of the restaurant. However, Marin was unable to recognize the specific individual who assaulted her.

Christine Gulutz, a bartender, was behind the bar when she was approached by a hooded man who demanded "all the money" at gunpoint. Gulutz complied with his demand.

Finally, the prosecution offered the testimony of Cheryl Bishop. Bishop was initially ordered to the floor at gunpoint by a man positioned at the cash register. Bishop recalled that she was subsequently led to the safe with a gun pressed to her head, and that her assailant told her that "he was going to count to five and [the safe] had better be opened." There was no indication as to whether the man who originally ordered her to the ground was the same man who eventually accompanied her

to the safe. In any event, Bishop admitted on cross-examination that she could not identify her attacker, and did not conclusively state whether she was accosted by more than one person.

In closing argument, the prosecutor summarized his theory of the case for the jury. He surmised that Mango Watts had assaulted Birrueta and taken money from the front cash register, while the unknown accomplice ("Bob") demanded money from Gulutz at the bar. The prosecutor emphasized that Shaw was liable for the independent acts of Watts and "Bob" as an aider and abettor. For his own part, the prosecutor suggested that Shaw had personally assaulted Marin by striking her with his gun, and had held a gun to Bishop's head while leading her to the restaurant safe and attempting to rob her.

In defense, Shaw's attorney offered no exculpatory evidence. Rather, he argued that Shaw was the victim of mistaken identity, supporting his argument by casting doubt on the eyewitness testimony and emphasizing the lack of physical evidence.

The judge instructed the jury with regard to the requisite elements of each of the underlying offenses. In addition, the judge explained that to personally "use[ ] a firearm ... means to display a firearm in a menacing manner, intentionally to fire it, or intentionally to strike or hit a human being with it." Ultimately, the jury returned a guilty verdict against Shaw on all counts. Specifically, Shaw was convicted of the robbery and assault with a firearm of both Eva Birrueta and Christine Gulutz, and assault with a firearm against Sonia Marin. On each count, the jury concluded that Shaw had been armed with a handgun in violation of California Penal Code § 12022(a)(1). In addition, Shaw was convicted of attempted robbery and assault with a firearm against Cheryl Bishop. The jury found the allegations that Shaw had "personally used a firearm" in violation of California Penal Code § 12022.5(a) to be true with regard to the assault of Birrueta, and the assault and attempted robbery of Bishop. Shaw was thereafter sentenced to eleven years and four months in prison.

## B. *Watts's Trial*

Watts's trial commenced on March 26, 1998, after his first trial had ended in a hung jury. The prosecutor contended to the jury that the evidence would show that Watts was "the one who was at the back safe dealing with Miss Bishop." Conversely, Watts's attorney asserted that the evidence would demonstrate that Shaw, not Watts, was the person identified as Bishop's assailant.

Eva Birrueta testified for the prosecution. For the most part, she simply repeated the gist of her testimony at the Shaw trial. However, she also positively identified Watts as the man who had struck her at the front cash register, explaining her failure to do so during the previous trial as a response to being frightened.

Dawn McGhie also testified, maintaining that Shaw had been the first robber to emerge from the kitchen, and that she had recognized him after hearing her friend, Michelle Jackson, shout out his name. In addition, McGhie also testified, though not unequivocally, that she concluded the second assailant to run from the kitchen was Watts after Jackson had screamed his name in recognition.

Finally, as in the first trial, Cheryl Bishop recounted her recollection of the September 3 events. As in Shaw's trial, Bishop was unable to identify her assailant as either Shaw or Watts.

The evidence presented at the two trials was thus almost identical, and supported

several critical conclusions: (1) Shaw, Watts, and an accomplice called "Bob" committed the robbery; (2) "Bob" assaulted and robbed Christina Gulutz;[2] (3) either Shaw or Watts assaulted and robbed Eva Birrueta; (4) either Shaw or Watts assaulted Sonia Marin; (5) either Shaw or Watts assaulted and attempted to rob Cheryl Bishop; and (6) the person who assaulted Marin was likely the same person who assaulted and attempted to rob Bishop.[3]

Watts's trial judge gave the jury an instruction identical to that given to Shaw's jury with regard to the "personal use of a firearm" enhancement. On March 30, 1998, Watts was convicted on all the same counts of robbery, attempted robbery, and assault for which Shaw's jury had convicted him. In Watts's case, however, while he was deemed to have "personally used a firearm" in connection with the crimes perpetrated against Bishop, the jury concluded that he had *not* done so with regard to the crimes against Birrueta, Gulutz, and Marin.[4]

### C. *Habeas Petition*

In January 2001, Shaw became aware of the California Court of Appeals decision in Watts's case, which stated that "under any version of the evidence, only one man actually held a gun to Ms. Bishop's head . . . .

Indeed, the evidence adduced at trial, which presumably was available to the prosecutor prior to trial, tends to support the conclusion that the jury in [Shaw's] trial was mistaken." *People v. Watts,* 76 Cal.App.4th 1250, 1259, 1261, 91 Cal. Rptr.2d 1 (1999). On January 25, 2001, Shaw filed a *pro per* exhaustion petition in the California Supreme Court. The petition was denied on January 30, 2001. On May 4, 2001, Shaw amended a pending habeas petition to assert a due process claim and an actual innocence claim. The district court denied the petition on August 5, 2002, and Shaw timely appealed.

### II.

Shaw's petition for habeas corpus is governed by the standards set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d). Under AEDPA, we would be entitled to grant Shaw's petition only if the state court's rejection of his due process claim was (1) "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *Van Tran v. Lindsey,* 212 F.3d 1143, 1154 (9th Cir.2000), *overruled on other*

---

2. Both Shaw and Watts were alleged to have been derivatively liable for the actions of their accomplices under an aiding and abetting theory. *See* CAL. PENAL CODE § 31 (defining as principals "[a]ll persons concerned in the commission of a crime," including those who "aid and or abet in its commission").

3. Other aspects of the evidence were either inconsistent, unclear, or called into question during cross-examination. For example, both Jackson and McGhie testified that Shaw kicked a female employee after exiting the kitchen, but none of the female employees confirmed being kicked. In addition, McGhie

testified that Shaw exited the kitchen immediately after "Bob" shouted "let's go," but later implied that Shaw had already exited the kitchen at that point. Jackson, by contrast, testified consistently that she saw Shaw exit the kitchen area *before* she heard Bob shout. Finally, owing in part to translation difficulties, Birrueta's equivocal testimony at Watts's trial that she recognized him from the robbery suggested that she may only have recognized Watts from previous encounters at trial.

4. Watts was, however, found to have been armed with a firearm in violation of California Penal Code § 12022(a)(1).

*grounds by* Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) ("[W]e may not, of course, reverse a state court's decision simply because it is inconsistent with a rule established by a Ninth Circuit case."). However, as we are mindful of the canonical admonition that "we avoid considering constitutionality if an issue may be resolved on narrower grounds," *Envtl. Def. Ctr., Inc. v. EPA,* 344 F.3d 832, 843 (9th Cir.2003), we do not reach the underlying merits of Shaw's due process claim. Rather, we conclude that, even if Shaw's due process rights were infringed by the prosecutor's decision to seek the personal use enhancement against Watts after successfully arguing in the earlier trial that Shaw had personally used a firearm against Bishop, such error was harmless.

### A.

■ Prosecutorial misconduct which rises to the level of a due process violation may provide the grounds for granting a habeas petition only if that misconduct is deemed prejudicial under the "harmless error" test articulated in *Brecht v. Abrahamson,* 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *Fields v. Woodford,* 309 F.3d 1095, 1109 (9th Cir. 2002); *see also Bains v. Cambra,* 204 F.3d 964, 976–78 (9th Cir.2000) (adopting the *Brecht* harmless error test, rather than that formulated in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), for habeas review of all state court decisions). *Brecht* requires that we independently evaluate whether an error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710 (internal quotation omitted). While there is no burden of proof *per se,* "[w]e look to the State to instill in us a 'fair assurance' that there was no effect on the

verdict." *Payton v. Woodford,* 346 F.3d 1204, 1217 (9th Cir.2003) (citation omitted).

■ Shaw was alleged to have personally used a firearm in connection with the attempted robbery and assault of Bishop, in violation of California Penal Code § 12022.5. CAL. PENAL CODE § 12022.5(a) ("[A]ny person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment . . . ."). California courts have construed § 12022.5 broadly in order to effectuate the legislative purpose of deterring the use of firearms. *See, e.g., People v. Granado,* 49 Cal.App.4th 317, 56 Cal. Rptr.2d 636, 639 (1996) ("[T]he term 'use,' as employed in this statute, should be broadly construed, consistent with common usage, to check the magnified risk of serious injury which accompanies any deployment of a gun in a criminal endeavor."); *In re Londale H.,* 5 Cal.App.4th 1464, 7 Cal.Rptr.2d 501, 503 (1992) ("The legislative intent to deter firearm use in the commission of a felony requires that 'use' be broadly construed."). Thus, a firearm may be "used" in a way that implicates § 12022.5 if it is employed " 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' [or] to 'apply to advantage.' " *In re Tameka C.,* 22 Cal.4th 190, 91 Cal.Rptr.2d 730, 734, 990 P.2d 603 (2000) (citations omitted). In defining the term "use," California courts have also referred to analogous statutes, determining that the term "use" means, at least, " 'to display a firearm in a menacing manner, to intentionally fire it, or to intentionally strike or hit a human being with it.' " *Granado,* 56 Cal.Rptr.2d at 639 n. 3 (quoting CAL. PENAL CODE § 1203.06(b)(3)). The latter definition has been incorporated into California's model jury instructions. *See* CALJIC No. 17.19 ("The term 'personally used a firearm,' as used in this instruc-

tion, means that the defendant must have intentionally displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck or hit a human being with it."). In the instant case, Shaw's jury was so instructed.

■ The broad construction given § 12022.5 by California courts indicates that Shaw could have been susceptible to a sentence enhancement for personal use of a firearm if the evidence demonstrated that he had menacingly brandished his gun, or intentionally struck someone with it, whether or not he was determined to have been the person who ordered Bishop to the safe. There was uncontradicted evidence from which a jury could reach such a conclusion. Michelle Jackson, Dawn McGhie, and another Lyon's patron, Frederick Sheppard, all testified that Shaw had run through the restaurant waving his gun in full view of all. Cheryl Bishop testified that, while walking down the service line, she heard an unidentified man shout "Everybody down on the floor. Get down on the floor now." She was then confronted by a man who pointed a gun directly at her and told her to get on the floor.[5] She was unable to identify either that individual, or the man who subsequently tapped her on the arm and forced her to lead him to the restaurant safe, also at gunpoint. There was not, however, any indication that it was the same person who had initially accosted Bishop and ordered her to the ground.

Thus, there was ample evidence from which the juries in Shaw's and Watts's cases, respectively, could have concluded that each man was subject to a sentence enhancement for personal use of a firearm in connection with the attempted robbery and assault on Cheryl Bishop. Although

the respective prosecutors each used their summations to advance a theory that the defendant currently on trial had been the perpetrator that led Bishop to the safe, the evidence permitted the juries to make a "personal use" finding whether or not they adopted the prosecutor's theory. The trial courts' instructions to the juries quite properly clarified that the defendant would be liable for a "personal use" enhancement if he had menacingly displayed, intentionally fired, or intentionally struck someone with his gun during the commission of the crime.

There are indeed cases where, despite manifest evidence of guilt, a prosecutor's misconduct was so severe that the trial errors it induced cannot be deemed harmless. In *United States v. Kojayan*, 8 F.3d 1315 (9th Cir.1993), for example, we reversed a conviction improperly obtained through the prosecutor's apparently willful misstatement of the status of an unindicted co-conspirator despite multiple opportunities to come clean, and explicit impugning of defense counsel. In *United States v. Blueford*, 312 F.3d 962 (9th Cir.2002), we reversed a conviction where the prosecutor had urged the jury to conclude that the defendant had fabricated an alibi when not only did the prosecutor have no evidence to support that inference, the available evidence directly contradicted it. This is not such a case. At most, the prosecutors offered the jury one plausible theory for the interpretation of ambiguous evidence. All pertinent evidence was laid before the jury, which was then instructed that it could return a verdict on the basis of actions other than those explicitly comprehended within the prosecutor's theory, including that Shaw would be liable for a "personal use" enhancement if it concluded

---

**5.** Bishop was unsure whether the man who initially shouted was the same man who or-

dered her to the ground.

that he had, in connection with the attempted robbery and assault of Bishop, menacingly brandished his gun. As there was overwhelming, uncontradicted evidence that he had, the prosecutor's arguably improper theory did not have a "substantial and injurious effect" on the jury's verdict. *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710 (citation omitted).

## B.

 We certainly do not take lightly the allegation that a prosecutor misled the jury during his closing argument. *Kojayan,* 8 F.3d at 1323 ("Evidence matters; closing argument matters; statements from the prosecutor matter a great deal."). We would be loath to endorse a prosecutorial decision to seek convictions against two men on identical evidence when only one of the two men could have committed the crime. *See generally Donnelly v. De-Christoforo,* 416 U.S. 637, 648–49, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (Douglas, J., dissenting) ("The function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial."). However,"[i]t is certainly within the bounds of fair advocacy for a prosecutor, like any lawyer, to ask the jury to draw inferences from the evidence that the prosecutor believes in good faith might be true." *Blueford,* 312 F.3d at 968. Even if we accept for the sake of argument Shaw's contention that the prosecutors exceeded "the bounds of fair advocacy" and violated his due process rights by arguing factually inconsistent positions in the trials of both him and Watts, we cannot conclude that the argument had a "substantial and injurious effect" on the jury's verdict. *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710 (citation omitted).

For the foregoing reasons, the district court's denial of Shaw's petition for a writ of habeas corpus is AFFIRMED.