## Commonwealth vs. Corinthian Calvin Housen, Jr.

Plymouth. September 14, 2010. -- January 20, 2011.

Present: Marshall, C.J., Ireland, Spina, Cordy, Botsford, & Gants, JJ.[1]

*Homicide. Practice, Criminal,* Capital case, Confrontation of witnesses, Assistance of counsel, Instructions to jury. *Evidence,* Joint venturer, Expert opinion, Hearsay, Photograph. *Joint Enterprise. Accessory and Principal. Constitutional Law,* Confrontation of witnesses, Assistance of counsel. *Robbery.*

The evidence at the trial of an indictment charging murder in the first degree, which established that the defendant knowingly participated in a plan to rob the victim with the requisite intent to rob, that he knew a gun could be used to accomplish the robbery, that he and two others took steps to carry out the plan, and that, in the course of the robbery, the victim was shot and killed, was sufficient to support the defendant's conviction of felony-murder based on a predicate offense of attempted armed robbery and the principle of joint venture liability [706-708]; moreover, the evidence also supported a finding beyond a reasonable doubt that the defendant was the shooter [708].

There was no merit to a criminal defendant's argument that the Commonwealth violated his due process rights by arguing contradictory theories of principal liability at the separate trials of the defendant and his codefendant. [708-709]

At a murder trial, there was no error in the admission of the opinion testimony of the medical examiner as to the victim's cause of death, based on an autopsy report and diagrams prepared by a nontestifying medical examiner, where the testifying examiner's opinion was based on independently admissible hearsay contained in the autopsy report and diagrams and photographs admitted in evidence, and where the hearsay evidence was the kind of evidence experts customarily rely on as a basis for opinion testimony [709-710]; moreover, although the medical examiner should not have been permitted to testify about details in the autopsy report during his direct examination, nothing in those details created a substantial likelihood of a miscarriage of justice [710].

At a murder trial, opinion testimony by a medical examiner and a firearms expert as to the distance between the end of the gun barrel and the surface of the victim's skin, based on an autopsy report, diagrams, and photographs prepared by a medical examiner who did not testify, did not, in the circumstances, violate the defendant's right to confront and cross-examine witnesses under the Sixth Amendment to the United States Constitution. [710-711]

A criminal defendant failed to demonstrate that his trial counsel's decision to stipulate to the admission of autopsy photographs constituted ineffective

---

[1]Chief Justice Marshall participated in the deliberation on this case prior to her retirement.

assistance, where the photographs were of the sort that is routinely admitted, were relevant to the case, and had witnesses available to authenticate them; and where, at any rate, the exclusion of the photographs would not have prevented Commonwealth witnesses from rendering opinions based on them. [711-713]

At a criminal trial, no reasonable jury would have understood the judge's instructions on intent to mean anything other than the Commonwealth had to prove that the defendant had the specific intent to commit an armed robbery. [713-714]

INDICTMENTS found and returned in the Superior Court Department on January 10, 2003.

The cases were tried before *Linda E. Giles*, J.

*Stewart T. Graham, Jr.*, for the defendant.

*Robert C. Thompson*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree on a theory of joint venture felony-murder and of the predicate felony, attempted armed robbery. The latter conviction was placed on file and is not before us on appeal. The defendant argues that he is entitled to a new trial, because (1) there was insufficient evidence of principal liability and the jury did not specify whether they found the defendant guilty as a principal or as a joint venturer; (2) the Commonwealth violated the defendant's due process rights by arguing contradictory theories of principal liability at the separate trials of the defendant and his codefendant; (3) a medical examiner and a firearms expert testified as to hearsay contained in an autopsy report and diagrams prepared by a nontestifying medical examiner, and they gave opinions based on those materials as well as autopsy photographs taken by the nontestifying medical examiner, in violation of the defendant's right to confront and cross-examine witnesses under the Sixth Amendment to the United States Constitution; (4) trial counsel was ineffective for stipulating to the admission of the autopsy photographs; and (5) the judge incorrectly instructed that attempted armed robbery required the Commonwealth to prove general intent rather than specific intent to rob. We affirm the conviction of murder and decline to exercise our power under G. L. c. 278, § 33E.

1. *Background.* The jury could have found the following facts. We reserve other details for discussion of particular issues.

The victim made a living selling marijuana from his third-floor apartment at 180-182 Green Street in Brockton, where he lived with his girl friend. The front door to the apartment building was always kept locked, and it had no electronic unlocking system. The victim's customers would ring his doorbell outside the front door to the apartment building. The victim either would go down to the front door and let them in or would go to the third-floor porch and ask who it was. If he knew the person he would throw down the key to the front door. The victim owned a .40 caliber semiautomatic handgun that he kept loaded at all times with two bullets. The gun was kept inside the middle cushion of the couch in his living room.

On the night of April 18, 2001, shortly before midnight, Joaquim Costa and his girl friend, who lived in a second-floor apartment at 180-182 Green Street, were sitting and talking in his car outside the apartment building. A maroon Toyota Camry automobile pulled up and parked in front of them. Three African-American men wearing hooded jackets got out of the Toyota and approached the apartment building. Two men entered the building. The third remained outside and rang the doorbell. He eventually entered.

The victim's girl friend, who was in bed by herself, heard people entering their apartment. One voice, which she recognized as that of Damon Cannon, said, "I don't know, an ounce." She previously had seen Cannon, who lived at 102 Green Street, at the apartment about seven or eight times buying marijuana. As she was getting out of bed she heard a deeper, louder voice say, "Run him," or "Run it," which she understood to mean the victim was being robbed. The defendant's voice is deeper and lower than Cannon's voice, which is "a little high pitched."

The victim's girl friend then heard three gunshots in rapid succession, followed by a fourth shot after a brief pause. As she approached the living room, she saw an African-American man run out the living room door into the common hallway. Damon Cannon was standing in front of the fish tank in the living room. He "looked shocked, surprised, [and] scared." He turned and ran out the door. She did not notice if he had a weapon, but he did not appear to have anything in his hands or tucked under his waistband.

The victim was lying on his back on the living room floor near

the couch. He was bleeding and his eyes were twitching. His girl friend telephoned 911. The victim's gun was on the floor near his left hand. It had two live rounds of ammunition. His wallet was on the floor near the gun. It was empty, but he had spent all his cash on dinner with his girl friend earlier that evening.

A neighbor who lived in the other third-floor apartment heard the gunshots, followed by two voices saying, "Let's go, let's go." He then heard, in sequence, people running down the stairs and "a car screeching off." A second-floor tenant heard two people running down the stairs just after the gunshots. She saw the driver of the Toyota help one person into the back seat of the car. A third person was already in the car. Joaquim Costa was still sitting in his car with his girl friend when he saw the same three men come out of the apartment building, get into the Toyota, and speed off. He did not specify whether the three men emerged from the building together. A woman who lived across the street heard the four gunshots and then saw two men run out of the apartment building and get into the Toyota, which then sped away.

The victim sustained two gunshot wounds to the back of his neck, and one to the back of his right wrist. Death was caused by a combination of (1) blood from the two neck wounds entering his airways, making it difficult for him to breathe, (2) loss of blood from the two neck wounds, and (3) brain damage resulting from shock waves produced by the bullet that entered the middle of the neck and traveled toward the right cheek, where a portion of the bullet exited the body.

Four projectiles were recovered. One was on the rug behind the couch, and a second went through the rug and into the floor. A third was recovered from the victim's clothing at a hospital. A portion of a fourth was recovered from the victim's right cheek at autopsy by a medical examiner. Two small lead fragments from one of the projectiles also were removed at autopsy from the victim's right wrist. A firearms expert opined that all four projectiles were fired from a single .38 caliber class weapon, which was not the victim's gun.

A medical examiner who did not perform the autopsy and the firearms expert opined that the presence of soot inside one of the neck wounds meant the gun that fired the bullet causing that

wound was no more than six inches from the victim's neck at the time of discharge. The two experts differed as to the distance between the second neck wound and the end of the gun barrel at the time of discharge. Based on the pattern of stippling, the medical examiner opined that distance to be four to eight inches, while the firearms expert believed the distance to be one to two feet. Both experts testified that the stippling pattern around the victim's wrist wound was produced by a gun that was fired within a distance of two feet.

Deoxyribonucleic acid (DNA) testing of blood on a coffee cup in the victim's apartment, blood on the wall by the living room door, blood on the walls of the interior common stairway leading to the front door of the building, and blood on the sidewalk leading up to the curb indicated that the defendant was the source of the blood. The defendant, using the name Corey Davis, sought medical attention the next day for lacerations on his left ring finger and thumb.

The defendant testified that he accompanied Cannon and Leroy Drane to the victim's apartment to purchase marijuana. He said the victim was standing in front of him when his facial expression changed. The victim reached into the couch and took out a gun. The defendant turned to flee when Cannon, who was behind him, fired a gun. A bullet hit the defendant's hand. He heard three more shots as he was leaving the apartment. He ran downstairs and entered the Toyota. Drane then emerged from the apartment building, followed by Cannon. The defendant denied knowing Cannon had a gun, and he denied involvement in the planning of a robbery.

2. *Sufficiency of the evidence.* The defendant contends that the evidence was insufficient to convict him as a principal in a joint venture felony-murder, and where the jury did not specify whether their verdict was based on a finding of principal or joint venture liability, his conviction must be reversed.

We do not "examine the sufficiency of the evidence separately as to principal and joint venture liability." *Commonwealth* v. *Zanetti*, 454 Mass. 449, 468 (2009). Instead, "we . . . examine whether the evidence is sufficient to permit a rational juror to conclude beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, with

the intent required to commit the crime." *Id.* The evidence in this case was sufficient to support a finding that the defendant was the shooter, and in any event it supported a finding that he participated in the joint venture.

The evidence was sufficient, see *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979), to support a conviction of the defendant for felony-murder based on a predicate offense of attempted armed robbery and the principle of joint venture liability. There was ample evidence that the defendant and others planned to rob the victim, and attempted to rob him. The three men approached the apartment building wearing "hoodies" that concealed their features. Two entered while one stayed behind to ring the doorbell. Cannon, a customer of the victim, would have been in a position to know that the victim would open the door to his apartment and, to see who rang, either go downstairs to the front door, or go out to the third-floor porch and look down at the front door. Once the front door was open, two proceeded up to the third floor while the third person remained downstairs. This enabled two of them to greet the victim as he opened the door to his apartment. The jury could have concluded that only two of the men, Cannon and the defendant, went up to the third floor because only two were heard talking and only two were heard running. Cannon was identified by the victim's girl friend as one of the men inside the apartment, and the defendant left a trail of blood from the victim's apartment. The jury could have inferred that the third man remained downstairs to serve as a lookout. The evidence permitted the inference that the defendant, whose voice was deeper than Cannon's, was the one who shouted, "Run him" or "Run it," meaning "rob him." The jury reasonably could have inferred that this was a cue pursuant to a predetermined plan among the defendant, Cannon, and the third man to rob the victim of drugs or money derived from drug sales conducted from his apartment.

In addition, the evidence supports an inference that the defendant knew a firearm would be used in the robbery. The victim, who was five feet, eleven inches tall and weighed about 200 pounds, was considerably larger than Cannon, who was five feet, five inches tall, and weighed about 140 pounds, and the defendant, who stood five feet, seven inches tall and weighed about 160

pounds. It was not likely that the victim would turn over his money, or drugs, to two much smaller men absent some show of superior force.by them other than the fact that they outnumbered him.

We conclude that the evidence was sufficient to establish that the defendant knowingly participated in a plan to rob the victim with the requisite intent to rob, that he knew a gun could be used to accomplish the robbery, and that he, Cannon, and the third man took steps to carry out the plan. In the course of the attempted armed robbery, the victim was shot and killed. The Commonwealth's prima facie case was thus established.

The Commonwealth was not required to prove who shot the victim, see *Commonwealth* v. *Santos*, 440 Mass. 281, 290 (2003), and it was not required to prove that the defendant intended that the victim be shot. See *Commonwealth* v. *Moran*, 387 Mass. 644, 649 (1982). The Commonwealth met its burden of proof by showing the defendant knowingly participated in an attempted armed robbery, that he intended to commit an armed robbery, and that the victim was killed in the course of the attempt to commit the armed robbery. *Id.*

The evidence also supports a finding beyond a reasonable doubt that the defendant was the shooter. When the victim's girl friend entered the living room and saw Cannon, he appeared stunned at what occurred, and he did not appear to have a gun in his possession. The jury could infer from this that the defendant had the gun. The jury could have inferred the defendant put one hand on the victim as the victim reached for his gun in the sofa, and then shot him in the back of the neck at close range. During the excitement the defendant also shot himself in the hand he placed on the victim.

3. *Due process claim.* The defendant argues that his due process rights were violated as a result of the Commonwealth's presentation of inconsistent theories of principal liability during his trial and the separate trial of his codefendant, Damon Cannon. In its case against Cannon, the Commonwealth prosecuted on the theory that Cannon and the defendant were joint venturers and, alternatively, that Cannon was the shooter. See *Commonwealth* v. *Cannon*, 449 Mass. 462, 467 (2007). In the instant case the Commonwealth proceeded on a theory that Cannon and the defendant

were joint venturers and, alternatively, that the defendant was the shooter.

Courts that have considered this issue generally hold that "a due process violation will only be found when the demonstrated inconsistency exists at the core of the State's case. Discrepancies based on rational inferences from ambiguous evidence will not support a due process violation provided the two theories are supported by consistent underlying facts." *Sifrit* v. *State*, 383 Md. 77, 106 (2004), cert. denied, 543 U.S. 1056 (2005). This is especially true with respect to cases against codefendants based on a theory of joint venture or a comparable theory of liability, where it cannot be determined which of the defendants fired the fatal shot, and where either defendant could have been convicted under either theory. See *Shaw* v. *Terhune*, 380 F.3d 473, 475 (9th Cir. 2004); *Loi Van Nguyen* v. *Lindsey*, 232 F.3d 1236 (9th Cir. 2000); *United States* v. *Paul*, 217 F.3d 989, 998-999 (8th Cir. 2000), cert. denied, 534 U.S. 829 (2001).

Here, the Commonwealth prosecuted Cannon and the defendant at separate trials under the same theory, namely, as joint venturers acting together to commit an armed robbery. The evidence is ambiguous as to who was the shooter, but whether either was or was not the shooter was not essential to the theory of joint venture. As previously discussed, all that was required of the Commonwealth was to prove each knowingly participated in an attempted armed robbery with the intent to commit an armed robbery. Any inconsistency in theories as to who was the shooter did not go to the core of the Commonwealth's case, and therefore no due process violation occurred.

4. *Sixth Amendment evidentiary issues.* The defendant argues that his Sixth Amendment rights to confront and cross-examine witnesses were violated when a medical examiner and a firearms expert were allowed to express opinions based on an autopsy report, diagrams, and photographs prepared by a medical examiner who did not testify, and also when both witnesses related factual matters contained in the autopsy report. *Crawford* v. *Washington*, 541 U.S. 36 (2004). There was no objection, so we review to determine if any error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992).

The opinion of the testifying medical examiner as to the cause of death was clearly his opinion, and not merely a recitation of the opinion of the medical examiner who performed the autopsy. He based his opinion on independently admissible hearsay contained in the autopsy report and diagrams, as well as photographs admitted in evidence. The hearsay evidence was the kind of evidence experts customarily rely on as a basis for opinion testimony. We have said that experts may testify in this fashion without violating the Sixth Amendment rights of confrontation and cross-examination. Such witnesses are available for cross-examination as to their opinions. They may not, however, discuss during their direct examination the details of the hearsay on which they based their opinion. Such details may be elicited only on cross-examination. See *Commonwealth* v. *Banville*, 457 Mass. 530, 541 (2010); *Commonwealth* v. *Nardi*, 452 Mass. 379, 390 (2008); *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531-532 (1986). There was no error in the admission of the opinion testimony of the medical examiner as to cause of death.

The medical examiner should not have been permitted to testify about details in the autopsy report during his direct examination. However, the defendant has not identified anything in those details that created a substantial likelihood of a miscarriage of justice. The cause of death was not disputed, and defense counsel elicited other details from the autopsy report that we will discuss shortly.

The medical examiner also gave opinion testimony concerning the "range of fire," that is, the distance between the end of the gun barrel and the surface of the victim's skin. He based his opinions in part on the presence of soot in one wound and stippling around the other two wounds as depicted in autopsy photographs admitted in evidence by stipulation. The medical examiner also based his opinions on the photographs in evidence, his review of the autopsy report, and his professional training and experience. He was available for cross-examination as to his opinions. The defendant's Sixth Amendment rights to confront and cross-examine the medical examiner thus were not violated. *Commonwealth* v. *Nardi, supra.* The defendant chose, as was his right, to cross-examine the medical examiner about differences between his opinion as to range of fire and that of the medical examiner who performed the autopsy. Counsel elicited specific

details from the autopsy report during cross-examination. See *id.*; *Department of Youth Servs.* v. *A Juvenile, supra.* There was no error in the manner in which the medical examiner expressed his opinions as to range of fire. His reference to details in the autopsy photographs during his testimony was entirely appropriate, as the photographs had been admitted in evidence by stipulation.

The opinion testimony of the firearms expert as to range of fire proceeded in a manner similar to that of the medical examiner. It was his own opinion, and it was based on the soot and stippling shown in the autopsy photographs admitted in evidence by stipulation. For the reasons stated as to the range of fire opinions of the medical examiner, the firearms expert's opinion testimony was proper and it did not violate the defendant's Sixth Amendment rights of confrontation and cross-examination.

5. *Ineffective assistance of counsel.* The defendant contends that counsel was ineffective by reason of his stipulation to the admission of the autopsy photographs in evidence. He argues that they were not properly authenticated and there was no strategic purpose for the stipulation. We review questions of ineffective assistance of counsel in a capital case under the more favorable standard of G. L. c. 278, § 33E (substantial likelihood of miscarriage of justice). *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992). That is, we consider whether there was error and, if so, "whether that error was likely to have influenced the jury's conclusion." *Id.* at 682 & n.1. Counsel's decision to stipulate to the admissibility of the autopsy photographs was one of trial strategy, and it will not be deemed ineffective in the constitutional sense unless it was manifestly unreasonable when made. See *Commonwealth* v. *Adams*, 374 Mass. 722, 728-730 (1978).

The burden is on the defendant to prove his claim of ineffective assistance of counsel. *Commonwealth* v. *Peloquin*, 437 Mass. 204, 210 (2002). We have said that "an ineffective assistance of counsel challenge made on the trial record alone is the weakest form of such a challenge because it is bereft of any explanation by trial counsel for his actions and suggestive of strategy contrived by a defendant viewing the case with hindsight." *Id.* at 210 n.5. We also have said that an ineffective assistance of counsel claim raised in the direct appeal, as here, generally will succeed only if attorney error "appears indisput-

ably on the trial record." *Commonwealth* v. *Zinser*, 446 Mass.
807, 811 (2006), quoting *Commonwealth* v. *Adamides*, 37 Mass.
App. Ct. 339, 344 (1994). Unless the trial record demonstrates
that no person could have authenticated the autopsy photographs,
then the defendant has failed to prove that counsel's stipulation
was manifestly unreasonable and the claim must fail. See *Commonwealth* v. *Randolph*, 438 Mass. 290, 297-298 (2002).

With respect to the question of error, the defendant must
show that if counsel had objected to the offer of the autopsy
photographs in evidence they would have been excluded. Cf.
*Commonwealth* v. *Williams*, 453 Mass. 203, 207 (2009) (to
establish ineffective assistance of counsel for failing to raise issue as to suppression of evidence, defendant must demonstrate
evidence would have been suppressed if properly challenged,
and counsel's omission created substantial likelihood of miscarriage of justice). On this record, the defendant has failed to
show that the photographs would have been excluded.

We have reviewed the photographs and conclude that
photographs such as these are routinely admitted, and there is
nothing to suggest the result would have been different in this
case. The photographs were relevant to both cause of death and
range of fire. See *Commonwealth* v. *Nadworny*, 396 Mass. 342,
366-367 (1985), cert. denied, 477 U.S. 904 (1986). The defendant does not claim that the photographs are unfairly prejudicial.
He does not contend that the photographs are not of the victim
at autopsy, or that the victim's wounds at the time of death
were not as they appear in the photographs. The defendant
argues that the photographs could not have been admitted because
they were not authenticated by the medical examiner who
performed the autopsy. However, that medical examiner is not
the only person who could have authenticated them. Any witness who could have testified that the photographs were a fair
and accurate representation of the victim's wounds could have
authenticated the photographs. See *Eldredge* v. *Mitchell*, 214
Mass. 480, 483 (1913); *Commonwealth* v. *Figueroa*, 56 Mass.
App. Ct. 641, 646 (2002). Absent a showing that no witness
could have authenticated the photographs, we conclude that the
defendant has failed to meet his burden of establishing error.[2]

---

[2]The record indicates that the medical examiner who performed the autopsy

Contrary to the defendant's assertion, even if he had demonstrated that the photographs would have been excluded because no witness was available to authenticate them, the exclusion of the photographs from evidence for this reason would not have prevented the testifying medical examiner and the ballistician from giving their range of fire opinions. Because the photographs qualify as independently admissible hearsay, the experts properly could have considered them as a basis for their respective range of fire opinions without the photographs being admitted in evidence. The witnesses simply could not have described the images in the photographs during direct examination. See *Department of Youth Servs.* v. *A Juvenile,* 398 Mass. 516, 531-532 (1986). It was the opinions, not the admission of the photographs in evidence, that were important to the Commonwealth's case. Even if counsel's decision to stipulate to their admission in evidence was manifestly unreasonable, there was no substantial likelihood of a miscarriage of justice.

6. *Jury instruction.* The defendant contends that the judge incorrectly instructed that attempted armed robbery required the Commonwealth to prove general intent, rather than specific intent, to rob. There was no objection to the instruction, so we review under the standard of a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright,* 411 Mass. 678, 681 (1992).

The defendant's focus is on one small portion of the judge's instruction where she stated the requisite intent involved "concentrating or focusing the mind for some perceptible period. It is a conscious act, with the determination of the mind to do an act." When reviewing a jury instruction, "we consider the charge in its entirety, to determine the 'probable impact, appraised realistically . . . upon the jury's factfinding function.' " *Com-*

had retired and was living in Florida. He was subject to laws compelling his attendance as a witness in criminal proceedings in this Commonwealth. See G. L. c. 233, § 13B; Fla. Stat. Ann. §§ 942.01-942.06 (West 2006). Where there is no reason to believe that the Commonwealth cannot satisfy some mundane aspect of its proof, as here, counsel is under no duty to require the Commonwealth to expend public funds to meet that obligation. Counsel's stipulation reasonably (and laudably) dispensed with the need to waste public funds for a purpose that in all likelihood would have resulted in authentication of the photographs without contest. Stipulations of this nature will rarely amount to ineffective assistance of counsel.

*monwealth* v. *Batchelder*, 407 Mass. 752, 759 (1990), quoting *Commonwealth* v. *Richards*, 384 Mass. 396, 399-400 (1981). "Jury instructions must be construed as a whole to prevent isolated misstatements or omissions from constituting reversible error." *Commonwealth* v. *Owens*, 414 Mass. 595, 607 (1993).

When viewed in context, the judge's reference to intent to do an "act" was a reference to the crime of attempted armed robbery. Her choice of words was surrounded by three other references, within a span of one and one-half transcript pages, to "specific intent to commit that particular crime" (armed robbery), "specific intent to commit a crime," and "the specific intent to commit armed robbery." No reasonable jury would have understood the judge to mean anything other than the Commonwealth had to prove that the defendant had the specific intent to commit an armed robbery. There was no error.

7. *G. L. c. 278, § 33E.* We have reviewed the briefs, the entire record, all the issues, and the arguments of counsel. We see no reason to exercise our powers under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial.

*Judgment affirmed.*