NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11411


COMMONWEALTH  vs.  STEVEN GONZALEZ.



Hampden.      September 11, 2015. - December 30, 2015.

Present:  Gants, C.J., Spina, Botsford, Duffly, & Hines, JJ.


Homicide.  Firearms.  Alibi.  Evidence, Alibi.  Constitutional
    Law, Assistance of counsel.  Practice, Criminal, Capital
    case, Assistance of counsel, Instructions to jury, Cross-
    examination by prosecutor, Argument by prosecutor,
    Presumptions and burden of proof.




    Indictments found and returned in the Superior Court
Department on December 17, 2008.

    The cases were tried before Mary-Lou Rup, J., and a motion
for a new trial, filed on July 22, 2013, was considered by her.


    Joseph A. Hanofee for the defendant.
    Deborah D. Ahlstrom, Assistant District Attorney, for the
Commonwealth.


    GANTS, C.J.  At approximately 5 P.M. on October 17, 2008, a

man approached the victim, Alexander Gautier, and shot him in

the face at close range with a sawed-off shotgun, killing him.

A Superior Court jury found the defendant guilty of murder in

the first degree on the theory of deliberate premeditation.[1]  The defendant claims on appeal that he is entitled to a new trial because he was denied the effective assistance of counsel.  He contends, first, that his trial attorney called an alibi witness to testify in his defense without first interviewing her, which resulted in the witness providing testimony contradicting the defendant's own alibi testimony.  Second, he contends that his attorney should have called certain individuals to testify in his defense who witnessed the immediate aftermath of the shooting, and whose testimony would have created a reasonable doubt regarding the identification of him as the shooter.  We conclude that these alleged errors were not "likely to have influenced the jury's conclusion."  See Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).  We therefore affirm the defendant's convictions.

Background.  The evidence supported the following facts. The victim had controlled the sale of narcotics in the low-rise apartment buildings in the area of 244-266 Locust Street in Springfield, but left for Puerto Rico when a warrant issued for his arrest.  In the victim's absence, Sammy Ramos (Sammy), a

---

[1] The jury also found the defendant guilty on indictments charging illegal possession of a sawed-off shotgun and of ammunition.  The jury found the defendant not guilty of illegal possession of a shotgun, after the judge instructed the jury that a shotgun is defined as a weapon with a barrel length equal to or greater than eighteen inches.

friend who operated an automobile dealership on Locust Street, took over the drug business on the block, and permitted others to sell drugs there, including two brothers, both named Jose Rodriguez.  Also during the victim's absence, Jasson Gonzalez (Jasson) began selling drugs on the block without Sammy's permission and had other individuals, including Miguel Angel Nieves (known as Mikey), selling drugs for him.  On October 17, 2008, the victim returned to Springfield and made clear his intent to regain control of his drug territory.  At approximately noon, the victim met with Sammy at the dealership and stated his interest in meeting with the people who had been selling drugs in his territory without permission.

The defendant was a heroin addict who supported his drug habit by theft, begging, and occasionally washing and detailing vehicles for Sammy at the dealership.  He lived with his girl friend, Daneris Rivera (Daneris), in an apartment at 258 Locust Street.  While the victim was still at Sammy's dealership in the early afternoon, the victim spoke to the defendant in Sammy's presence.  The victim told the defendant that he had to "stop stealing from the neighbors" or leave.

Julia Rojas (Julia) is the former girl friend of Sammy's brother, and Sammy describes her as "like a daughter" to him.  At approximately 4:30 P.M., Julia saw the defendant, whom she knew, speaking with Jasson and Mikey on the rear porch of the

apartment building at 258 Locust Street. Shortly before 5 P.M., the victim and Sammy walked from the dealership to the area behind 258 Locust Street, accompanied by the two Rodriguez brothers. Once they arrived, Sammy told Mikey to get Jasson so they could talk. The six men -- the victim, Sammy, the two Rodriguez brothers, Jasson, and Mikey -- began talking while standing in a semicircle on the pavement behind 258 Locust Street.

Julia was on the third-floor porch overlooking the back of 258 Locust Street, saw Sammy on the pavement with the others, and walked down the back stairs towards him. As she approached, she saw the defendant walk behind her wearing a black hooded sweatshirt and a mask. Sammy, who was standing next to the victim, also saw the defendant walk behind Julia and approach the group. As the defendant approached, Sammy saw him pull up a handkerchief from around his neck to cover his face. Once he reached the group, he pulled out a sawed-off shotgun and fired a single shot at the victim's face at close range, killing him. After the shotgun blast, Jasson, Mikey, and the Rodriguez brothers immediately scattered. Sammy testified that the defendant then pointed the shotgun at Sammy, who had fallen next to the victim, and told him, "This is not with you."[2] The

_____

[2] Julia Rojas had a slightly different recollection. She testified that, after the defendant had shot the victim in the

defendant then attempted to enter the first-floor apartment at 258 Locust Street, without success, and ran towards 244 Locust Street.

After the shooting, both Sammy and Julia gave statements to the police. Julia described what had occurred, identified the defendant as the shooter, and provided a description of the shotgun used in the attack. She also told the police that she saw the defendant run in the direction of 244 Locust Street and thought he might hide there because the apartment building was abandoned. That night, after receiving the information provided by Julia, the police recovered a twelve-gauge sawed-off shotgun inside an incinerator just outside the basement of 244 Locust Street. After the police brought the shotgun back to the station, Julia identified it as the one used by the shooter.

The shotgun was recovered with a spent shell partially ejected from the chamber and four unfired shells in the magazine.[3] The shotgun, the spent shell, and the unfired shells were swabbed to collect any deoxyribonucleic acid (DNA) evidence that may have been left on those items. The criminalist who

---

face, he pointed the gun at Sammy Ramos (Sammy), and she heard a sound like a firework that lights up but does not explode. The defendant then told Sammy, "Don't worry, this is not your day."

[3] State police Sergeant Thomas Murphy, a firearms examiner, testified that the sawed-off shotgun could not load another shell using its pump action in the ordinary manner because the shotgun had been modified incorrectly.

swabbed the shotgun used two swabs, each of which was used to swab the stock, the grip, and the trigger of the shotgun.[4] As part of their investigation, law enforcement obtained DNA samples of the defendant, the victim, and Jasson. The swabs from the shotgun were found to contain a mixture of two or more persons' DNA with the defendant matching the major profile of that mixture; the victim and Jasson were excluded as potential sources of the minor profile.[5] The swabs from the unfired shells also contained a mixture of two or more contributors with Jasson matching the major profile.[6] There was insufficient DNA to make a determination as to the minor profile on the unfired shells.

During the autopsy of the victim, the medical examiner recovered plastic wadding from a shotgun shell and lead fragments from the victim's brain. The diameter of the wadding was consistent with the wadding that would be used in a twelve-

---

[4] As a result, the presence of a person's deoxyribonucleic acid (DNA) on any one of those surfaces would indicate that the person touched the shotgun, but would not reveal which of those surfaces he or she touched.

[5] The statistical probability of a randomly selected person matching the major profile of the DNA found on the shotgun is one in 4.312 billion for Caucasians, one in 3.784 billion for African-Americans, one in 2.486 billion for Hispanics, and one in 2.958 billion for Asians.

[6] The statistical probability of a randomly selected person matching the major profile of the DNA found on the unfired shells is one in 5.252 billion for Caucasians, one in 2.827 billion for African-Americans, one in 680.7 million for Hispanics, and one in 2.22288 billion for Asians.

gauge shotgun shell. The lead fragments were consistent with a shell containing a one-ounce slug, which can only be fired by a twelve-gauge shotgun.

At trial, the defendant offered an alibi defense. In support of that alibi, the defendant called Carol Adorno, who lived with the defendant's oldest sister at the time of the shooting. Adorno testified that the defendant arrived at her house at approximately 3:30 P.M. on the day of the shooting and remained there "until the nighttime," except that the defendant and Adorno's husband briefly left to retrieve the defendant's girl friend's vehicle, which had broken down. Adorno also testified that she took a photograph of the defendant with his niece while in her house sometime after dark.[7] The photograph was admitted in evidence, but it had no date or time indicating when it was taken.

After Adorno testified, the defendant testified in his defense. The defendant told the jury that, on the day of the shooting, he helped his girl friend, Daneris, pack her belongings because she was being evicted from her apartment at 258 Locust Street. He then drove with her to a storage facility in Connecticut to store her belongings; he could not recall which city or town he traveled to in Connecticut. When he was

_____

[7] There was testimony that it was getting dark at 6:30 P.M. on the day of the shooting.

driving back from Connecticut, the defendant received a telephone call from Mikey saying that he "better not come to the block" because "they were saying" that he had killed the victim, and "what [he] did was wrong." After receiving this news, the defendant and his girl friend had an argument "about money [and] drugs," and he stopped the vehicle in West Springfield and walked to Adorno's house, arriving there a few minutes before it got dark.[8] At Adorno's house, he ate, had a "good time with the family," and thought about what he was going to do because he feared they would "jump" him if he returned to Locust Street. He then "went back to some spot to get some drugs," and the next day left for Syracuse, New York, where he stayed at his cousin's house.

On cross-examination, the defendant testified that he saw the shotgun recovered by police the day before the shooting, when he was washing a vehicle at the dealership and Sammy asked the defendant to move the shotgun from the trunk of one vehicle to another vehicle. He explained that his handling of the shotgun on the day prior to the shooting must have been how DNA matching his profile was recovered from the weapon.

After being challenged about the timing of his travel to Connecticut and the location of the storage facility on cross-

---

[8] The defendant testified that he "broke" the vehicle when he stopped it because he "threw the gear from drive to park without pressing the brake."

examination, the defendant's recollection was refreshed by a receipt from the storage facility. The receipt, in Daneris's name, reflected a transaction at a storage facility in Suffield, Connecticut, at 5:18 P.M. on the day of the shooting.

After his convictions, the defendant moved for a new trial, making the same claims he makes on direct appeal.[9] The trial judge denied the motion in a carefully considered memorandum of decision without an evidentiary hearing.

Discussion. 1. Ineffective assistance of counsel. The defendant, represented by new counsel on appeal, claims that he was denied his constitutional right to the effective assistance of counsel for two reasons. First, he argues that his trial attorney failed to interview Adorno before putting her on the witness stand and therefore failed to recognize that her alibi testimony would contradict that of the defendant. Second, he contends that his trial attorney failed to call two witnesses to testify who would have offered new evidence regarding the immediate aftermath of the shooting that would have raised a reasonable doubt as to whether the defendant was the shooter. Because we review a conviction of murder in the first degree under G. L. c. 278, § 33E, and because "the statutory standard of § 33E is more favorable to a defendant than is the

---

[9] The defendant also faulted his trial counsel for not requesting a jury instruction on intoxication, but he does not pursue that claim on appeal.

constitutional standard for determining the ineffectiveness of counsel," we "need not focus on the adequacy of trial counsel's performance" in reviewing such claims but rather "consider whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." Wright, 411 Mass. at 682. See Commonwealth v. Riley, 467 Mass. 799, 807-808 (2014).

a. Alibi testimony. In an affidavit submitted with the defendant's motion for a new trial, Adorno attested that she was not interviewed by trial counsel before she testified, that she made no written statement, and that "[n]o one" (including, implicitly, a defense investigator) had asked her the questions she was asked at trial. The defendant also submitted an affidavit from trial counsel in which counsel did not address whether he or a defense investigator had questioned Adorno before she testified, but attested only that he "did not have a tactical or a strategic reason for putting on an alibi defense in which the alibi witnesses . . . gave contradictory testimony." Because Adorno's affidavit was uncontradicted and because there was no evidentiary hearing, we assume the truth of Adorno's assertions for purposes of this appeal and conclude that defense counsel erred in calling Adorno to testify as an alibi witness without knowing what she would say.

In determining whether that error "was likely to have influenced the jury's conclusion," Wright, 411 Mass. at 682, we note that the only evidence offered in support of the defendant's alibi was the testimony of the defendant and Adorno. Thus, we consider whether the credibility of the defendant's testimony would have been materially stronger had defense counsel interviewed Adorno before trial and decided to forgo offering her testimony. There is no question that Adorno's testimony provided the defendant with an alibi that was materially different from and inconsistent with the defendant's alibi testimony. Adorno testified that the defendant was at her home from approximately 3:30 P.M. until after sunset. The defendant testified that he was with his girl friend in Connecticut at or around the time of the shooting, that he learned about the shooting when he was driving back from Connecticut, and that he did not arrive at Adorno's house until shortly before nightfall. The prosecutor noted the contradiction in his closing argument: "So he's in Connecticut with his girlfriend at 5:01, and he's at Carol Adorno's house at 3:00. Which is it?"

But we agree with the motion judge's conclusion that defense counsel's decision to call Adorno to testify was not likely to have influenced the jury's verdict because the defendant's alibi, had it stood alone, was "unsupported, lacking

in credibility, and at odds with the significant evidence pointing to him as [the] person who shot [the victim]." The only corroboration of the defendant's alibi was the receipt -- referenced in the defendant's testimony but not admitted in evidence -- reflecting a transaction at a storage facility in Suffield, Connecticut, at 5:18 P.M. on the day of the shooting. That receipt, however, bore the name of Daneris, not the defendant, and the defendant offered no testimony from anyone at the storage facility to corroborate that Daneris was not there alone. Nor did the defendant call Daneris, the person he claimed he was with at the time of the shooting, to testify in support of his alibi.[10]

Also, the defendant's testimony that he learned of the shooting from Mikey while driving back from Connecticut was a double-edged sword, because he recalled that Mikey accused him of committing the killing ("what you did was wrong"). Yet, Sammy and Julia both placed Mikey in the semicircle of persons speaking with the victim at the time of the shooting, so presumably he would have had firsthand knowledge of the identity of the shooter.

---

[10] The defendant does not contend that his trial attorney was ineffective for failing to call Daneris Rivera to testify. Nor, based on our review of the record pursuant to G. L. c. 278, § 33E, do we see any factual support for such a claim.

Further, his explanation as to how his DNA got on the shotgun strained credulity. When questioned by police after his arrest in Syracuse, he was asked about his possession of a shotgun and said nothing about Sammy asking him to move a shotgun from one vehicle to another at the dealership. When asked at trial why he had failed to mention this to the police, he answered that he did not do so because the police asked whether he had possessed a shotgun on the day of the shooting, not whether he possessed one on other days.[11]

Nor did the defendant's testimony persuasively support the argument of defense counsel that Sammy had solicited someone else to kill the victim so that Sammy could continue to control the drug operation in the neighborhood. To counter the eyewitness identifications by Sammy and Julia, both of whom knew the defendant well and were within a few feet of the shooter, defense counsel contended that Sammy had planned in advance to falsely accuse the defendant of the crime by causing him to touch the murder weapon and by causing Julia to join Sammy in falsely identifying the defendant as the shooter. Yet, the defendant offered no testimony regarding any acrimony between Sammy and him that would have caused Sammy to plan to frame him.

---

[11] The Commonwealth chose not to offer testimony in its case-in-chief regarding the defendant's interrogation after his arrest in Syracuse, New York. The jury learned of it only because the defendant spoke of it during his testimony.

In short, although Adorno's contradictory alibi testimony likely diminished the credibility of the defendant's alibi, we are convinced that Adorno's testimony did not likely influence the jury's verdict.  Given the strength of the Commonwealth's evidence -- Sammy and Julia identified the defendant as the shooter, the defendant's DNA was consistent with the DNA found on the apparent murder weapon, and the defendant fled the day after the shooting to Syracuse -- the defendant's testimony, had it stood alone, was not likely to have been regarded as sufficiently credible to create a reasonable doubt regarding the defendant's guilt.

b.  Failure to call witnesses.  The defendant claims that his counsel was ineffective for failing to call two witnesses: Julio Marcano and Springfield police Officer Daniel Brunton.

In a statement to police, Marcano said that he lived in Springfield in a residence that abutted the rear of 258 Locust Street.  He recalled that he was working in his backyard and speaking on the telephone to a friend on October 17, 2008, when he heard a gunshot from the other side of his fence.  He ended the telephone call with his friend and telephoned 911, noting the time as 5 P.M. exactly.  He spoke with one person who answered the 911 call and then was transferred to another person.  While describing what he had heard to the dispatcher, he pulled a chair up to his fence and looked over into the rear

of 258 Locust Street. He stated that, about twenty-five feet away, he saw one "Spanish guy" lying on the ground bleeding from his head and three "Spanish" people, including one female, walking east away from the body. At that moment, he noticed another "Spanish guy" walking "real fast" away from the body. Marcano thought that this person was involved in the shooting because he looked "real nervous" and "wanted to get out of there." That person walked up the back stairs to one of the buildings, pushed aside a group of people on the second-floor porch, and went into an apartment. The man looked to be in his early thirties, was dark skinned, and had short hair pulled into a small ponytail.[12] Marcano declared in a subsequent affidavit that he looked over his fence approximately sixty seconds after he heard the gunshot.

Officer Brunton arrived at the crime scene in the moments after the shooting, and he authored a "Forced Door Report" regarding what happened. According to that report, when he and two other officers arrived at the rear of 258 Locust Street, the officers were told by an unidentified person that the shooter had fled into a particular apartment at 252 Locust Street. Officer Brunton and four fellow officers went up the rear stairs to that apartment, and while they remained outside the rear

---

[12] The defendant was described as having "light colored skin" and a "fade" haircut, apparently without a ponytail.

door, one of his fellow officers saw two Hispanic males inside the kitchen.  When Officer Brunton knocked on the door, the two men fled the apartment.  Officer Brunton then forced open the rear door of the apartment, but the officers were unable to locate the two individuals.  Mikey and Awilda Nieves lived in that apartment, but they were already outside the building when this occurred, and they reported that no one else had a key to their apartment.

Trial counsel submitted an affidavit in support of the motion for a new trial in which he stated that he did not have a tactical or strategic reason for not calling Marcano or Brunton. We need not decide whether counsel was ineffective for not having called these witnesses to testify, because we agree with the trial judge that their testimony would not likely have influenced the jury's verdict.

Although Marcano's testimony would have differed to some degree from the testimony of the Commonwealth's witnesses regarding the events immediately following the shooting, it would not have directly contradicted the identification of the defendant as the shooter.  Marcano did not see the shooting and did not see anyone holding a firearm.  Marcano saw a man walking "real fast" away from the site of the shooting approximately sixty seconds after the shot was fired, but the testimony of the other witnesses established that, apart from the victim, at

least five men and one woman were at the scene of the shooting. Because the victim had just been shot in the face at close range with a sawed-off shotgun in a drug-related shooting, there could be many reasons why a man other than the shooter would walk quickly and appear nervous in fleeing the scene. Where Marcano estimated that approximately sixty seconds had passed since the shot was fired and where Marcano did not observe the fleeing man to be carrying a firearm, there is little reason why a reasonable jury would have inferred that the fleeing man was the shooter. Therefore, the fact that the description of the fleeing man did not match the defendant's appearance would not likely have influenced the jury's verdict. See Commonwealth v. Britto, 433 Mass. 596, 602-603 (2001) (failure to call witnesses did not prejudice defendant where impact of those witnesses would be "marginal at best").

Turning to Officer Brunton, even if he were allowed to testify to all that he wrote in his report, the evidence he would have offered would not have been inconsistent with the defendant being the shooter. There was evidence that Jasson, Mikey, and the defendant each had reason to be unhappy about the victim's return and his intent to regain control of drug distribution in the Locust Street neighborhood. Because the defendant was seen with Jasson and Mikey shortly before the shooting, evidence that two Hispanic males had fled to Mikey's

apartment, and later escaped when the police arrived, would be consistent with the inference that the defendant and Jasson ran to Mikey's apartment after the defendant shot the victim. We acknowledge that Julia testified that, if the defendant had run towards 252 Locust Street, she "would have seen him because you can see all of it from the porch." But where Sammy testified that the defendant unsuccessfully tried to enter an apartment at 258 Locust Street immediately after the shooting, where Julia testified that she saw the defendant run in the direction of 244 Locust Street, and where 252 Locust Street is located between 244 and 258 Locust Street, we are convinced that, if the defendant were to have placed in evidence all the information contained in Officer Brunton's report, its admission would not likely have affected the jury's verdict. See Britto, supra.

2. Remaining claims. The defendant claims that various errors were made by the prosecutor and judge. None were preserved by a contemporaneous objection, so we review to determine whether any created a substantial likelihood of a miscarriage of justice. See, e.g., Commonwealth v. Penn, 472 Mass. 610, 625-626 (2015).

a. Alibi instruction. The defendant did not request an alibi instruction and did not object to its omission after the judge instructed the jury. Nonetheless, the defendant argues on appeal that the failure of the trial judge to instruct the jury

regarding an alibi defense sua sponte resulted in a substantial likelihood of a miscarriage of justice. We disagree.

"When evaluating jury instructions, 'we consider the charge in its entirety, to determine the "probable impact, appraised realistically . . . upon the jury's factfinding function."'" Commonwealth v. Walker, 466 Mass. 268, 284 (2013), quoting Commonwealth v. Batchelder, 407 Mass. 752, 759 (1990). "[I]t is well settled that an 'alibi instruction is not required where the charge as a whole makes clear that the Commonwealth must prove beyond a reasonable doubt that the defendant committed the crime for which he was indicted.'" Commonwealth v. Walker, 460 Mass. 590, 614 (2011), quoting Commonwealth v. Thomas, 439 Mass. 362, 371 (2003). Here, the trial judge repeatedly emphasized in her instructions that the Commonwealth bore the burden of proving every element of each charged crime beyond a reasonable doubt. In particular, the judge specifically instructed the jury on evaluating eyewitness identifications and informed the jury that "the prosecutor must have proved beyond a reasonable doubt the identity of [the defendant] as the perpetrator of the offenses with which he has been charged." There was no danger that the jury believed that they could convict the defendant even if they found him not to be present at the scene of the shooting, and thus there was no substantial likelihood of a

miscarriage of justice due to the failure specifically to furnish the jury with an alibi instruction.

b. Burden of proof. The defendant claims that the judge in her final instructions shifted to the defendant the burden of creating reasonable doubt that he was the shooter by giving the following instruction:

> "It is important that you understand that unlike inferences that may be used in proving guilt, inferences which create some doubt about whether a person committed a crime do not have to be proved beyond a reasonable doubt. If an inference you draw from the evidence in this case creates a reasonable doubt in your mind as to any element of a crime charged or whether the defendant . . . committed that offense, then you must return a verdict of not guilty on that particular offense."

This instruction made clear to the jury that an inference that creates a reasonable doubt is sufficient to find the defendant not guilty; the inference negating guilt need not be proved beyond a reasonable doubt. No reasonable jury would understand this instruction to shift the burden of proof to the defendant. Moreover, as noted earlier, the trial judge made repeated references in her charge to the prosecution's burden to prove each and every element of the charged crimes, including when she commenced her instruction regarding inferences. The defendant's claim is without merit.

c. References to the defendant's pretrial confinement. The defendant contends that the prosecutor's questions during his cross-examination of the defendant that referred to the

defendant's pretrial confinement created a substantial likelihood of a miscarriage of justice. The prosecutor asked the defendant whether he telephoned Daneris after he had been arrested, and whether she visited him or received calls from him while he was in jail.[13] When called to sidebar, defense counsel stated that he did not object because he did not want to call attention to the defendant's confinement. The judge immediately

---

[13] In relevant part, the questioning went as follows before the judge sua sponte stopped the exchange and called counsel to sidebar:

Q.: "Did you call her after you got arrested on this case?"

A.: "No."

Q.: "You didn't call her from the jail from Syracuse?"

A.: "From Syracuse?"

Q.: "Yeah."

A.: "I don't recall that. I can't tell you."

. . .

Q.: "She doesn't come visit you at the jail?"

A.: "No. That's my girlfriend right there. I'm not with that lady no more."

Q.: "How long has it been since you've no longer been with Daneris?"

A.: "I don't know. Months. A year. Over a year."

Q.: "When was the last time she visited you at the jail?"

A.: "She wanted to see me --"

instructed the jury that they were to "disregard any questions that were asked about any type of visits to the jail. . . . This has nothing to do with this case, and you're not to conclude anything from that or take that into account in any way."

There is no substantial likelihood of a miscarriage of justice. The references to the defendant's confinement were brief, and suggested that he was in custody awaiting trial on the pending murder charge, not that he had been convicted of other unrelated crimes. See United States v. Deandrade, 600 F.3d 115, 119 (2d Cir.), cert. denied, 559 U.S. 1102 (2010) (holding that "a brief and fleeting comment on the defendant's incarceration during trial, without more, does not impair the presumption of innocence"). Moreover, immediately after the final reference to the defendant's pretrial confinement, the judge instructed the jury that they were to disregard the references and not to take them into account in any way. Jurors are presumed to follow such instructions. See Commonwealth v. Sylvia, 456 Mass. 182, 195 (2010).

d. Burden shifting. The defendant argues that the prosecutor in his cross-examination of the defendant and again in closing argument suggested that the burden was on the defendant to produce a witness who would corroborate his alibi. As to the cross-examination of the defendant regarding his

contact with Daneris and his knowledge of her whereabouts, the questioning was proper because it was apparent from the defendant's testimony that Daneris could be the key witness to corroborate his alibi testimony, and the prosecutor was entitled to attempt to elicit the factual predicates required for a missing witness instruction.  See Commonwealth v. Rollins, 441 Mass. 114, 117-118 (2004).  After the prosecutor asked whether the defendant knew of Daneris's whereabouts and inquired when the defendant had last seen her, he ended that line of questioning.  Any inference that the defendant had an obligation to call Daneris as a witness was cured by the judge's instructions regarding the burden of proof, which made clear that the prosecutor bore the burden of proving the identity of the defendant as the perpetrator of the shooting beyond a reasonable doubt.

The defendant also argues that the prosecutor in closing argument shifted the burden to the defendant to establish that he was not the shooter.[14]  Viewed in the context of the

_____

[14] The defendant rests this argument on the following statements in the prosecutor's closing argument:

"So what does he do?  Does he come forward and say, Hey, I was in Connecticut.  I couldn't have possibly been there.  And . . . , by the way, he told the police he was in Hartford.  And he told you from the stand that he was somewhere else and he had to look at the receipt in order to remember what that city was.  Why?  Because he wasn't there.  Because if he were there, wouldn't it be a surefire

prosecutor's entire closing argument, a reasonable jury would understand the prosecutor to be challenging the credibility of the defendant's alibi by focusing on the defendant's motivation to create a false alibi. Although the prosecutor carelessly told the jury that the defendant "needs to bring a witness to you," this isolated statement did not create a substantial likelihood of a miscarriage of justice by suggesting that the defendant bore the burden of presenting an alibi, particularly in light of the judge's instructions on that point.

Conclusion. We have reviewed the entire record of the case pursuant to our duty under G. L. c. 278, § 33E, and find no just reason to exercise our authority to order a new trial or to reduce the verdict of murder in the first degree. The order denying the motion for a new trial is affirmed, and the judgments of conviction are affirmed.

So ordered.

---

alibi that at 5:01 P.M. on October 17th of 2008 he was in the city in Connecticut helping his girlfriend unload some boxes? What more do you need? . . . And what does he do? He needs to bring a witness to you, Carol Adorno who is a friend of his sister's who brings in a photograph that he puts into evidence. And what does she say? He was at my house. I got home at 3:00 that day, could have been 3:30, but I certainly remember it was 3:00, and he was there until way past 7:50 when that picture was taken. His words, I can't be at two places at the same time. So he's in Connecticut with his girlfriend at 5:01, and he's at Carol Adorno's house at 3:00. Which is it?"