NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10079


            COMMONWEALTH  vs.  DENNIS M. BATEMAN.



        Franklin.     October 14, 2025. - February 20, 2026.

        Present:  Budd, C.J., Kafker, Wendlandt, Georges,
                    & Wolohojian, JJ.



Homicide.  Evidence, Sound recording, Disclosure of evidence,
     Exculpatory, Impeachment of credibility, Expert opinion.
     Practice, Criminal, Disclosure of evidence, Assistance of
     counsel, New trial.  Witness, Impeachment, Expert.




     Indictments found and returned in the Superior Court
Department on July 8, 2005.

     Following review by this court, 492 Mass. 404 (2023), a
motion for a new trial, filed on December 4, 2020, was heard by
John A. Agostini, J.


     Amy L. Codagnone for the defendant.
     Steven E. Gagne, Assistant District Attorney, for the
Commonwealth.


     KAFKER, J.  The defendant, Dennis M. Bateman, was convicted

of two counts of murder in the first degree for the deaths of

Brandy Waryasz and her viable, unborn child.  The defendant

appealed from the convictions and filed a motion for a new trial

alleging numerous issues, which we remitted to the Superior Court. The motion judge, who was also the trial judge, denied the motion, and the defendant appealed. The direct appeal was joined with the appeal from the denial of the motion for a new trial. After plenary review, we affirmed the murder convictions and the denial of the motion for a new trial, and we declined to grant extraordinary relief pursuant to G. L. c. 278, § 33E. See Commonwealth v. Bateman, 492 Mass. 404, 405-406 (2023).

While the consolidated appeal was pending, the defendant filed a second motion for a new trial, and he amended that motion twice prior to the issuance of the rescript for the consolidated appeal. We remitted the second motion for a new trial to the Superior Court; the same judge who had presided at the trial denied the motion, and the defendant appealed. The defendant now argues that the judge erred in concluding he was not entitled to a new trial due to (1) the Commonwealth's failure to disclose a segment of an audio recording of a police interview with a potential trial witness, (2) newly discovered anomalies that cast doubt on the authenticity of audio recordings of the defendant's second interview with police officers, or (3) ineffective assistance of both trial and prior appellate counsel. We affirm.

1.  Background.  We present the relevant factual background as proven at trial,[1] as well as the procedural history.  We reserve certain facts from the record for the instant appeal for later discussion.

a.  The homicide.  On Saturday, April 16, 2005, Waryasz, who was thirty to thirty-two weeks pregnant, was working a shift from 2 P.M. to 9 P.M. as the sole attendant at a gasoline station located in Deerfield.  The defendant, a forty year old, African-American man with a history of "crack" cocaine use, stopped by the gasoline station during Waryasz's shift -- although his precise arrival and departure times are unclear.  Between 5 P.M. and 6:30 P.M., however, several witnesses saw the defendant's distinctive, black 1988 Ford Econoline van parked outside of the gasoline station's office building and the defendant speaking to Waryasz.[2]  During a lull in customers sometime around 6:30 P.M., the defendant attacked Waryasz,

---

[1] The evidence presented in the defendant's trial is summarized in more detail in Commonwealth v. Bateman, 492 Mass. 404, 406-410 (2023).  We provide a condensed version of events here, with a particular focus on facts, as the jury could have found them, relevant to the issues before us.

[2] One of these witnesses was David Williams, who reported seeing the van at approximately 6:30 P.M.  Williams "immediately" recognized the van as the defendant's because he had sold black spray paint to the defendant, and when making the purchase, the defendant showed Williams the van and said he intended to paint his van black.  Williams thus recognized the van's distinctive "spray can paint job."

tightly wrapping a ligature -- a black nylon-like belt or strap -- around her neck and tying it in a knot in the rear. He left her lying in one of the gasoline station's service bays, took the cash register to his van, and drove away. At approximately 6:42 P.M., a customer entered the gasoline station's office building to purchase gasoline but found no one inside. The customer then walked into the service bay adjoining the office and found Waryasz's body lying on the ground. Both Waryasz and her unborn child died as a result of the ligature cutting off Waryasz's airflow. The cash register, as well as the approximately $350 that had been in it, were never recovered.

The defendant, meanwhile, had driven back to Greenfield. He was observed with "lots of money" at various points throughout the night, and he purchased and smoked $250 worth of crack cocaine with multiple companions. The defendant also periodically asked his companions to make sure his family was taken care of "if anything happen[ed] to him" because he had "messed things up." In the days that followed, the defendant pressed some of those he encountered on April 16 to confirm that he was in Greenfield at or about the time of the murders. All those he approached, however, had seen him either before or after the time of the murders.

b. The investigation. On April 18, 2005, police officers interviewed the defendant at the district attorney's office in

Greenfield.  Approximately the first hour of the interview was not audio recorded.  Instead, police drafted a written statement based on what the defendant revealed during that hour, which the defendant reviewed, signed, and then read aloud so that it could be audio recorded.  While at the district attorney's office, the defendant made several unsolicited, incriminating statements to the officers.  The defendant told one interviewing officer, "You know, we were only horsing around, [Waryasz] and I, pushing and shoving."  The officer asked the defendant what he meant, and the defendant explained that Waryasz had been snapping a black belt at him.  The defendant had not mentioned the belt during the interview, and the police had not yet publicly disclosed that Waryasz had been strangled.  Shortly thereafter, the defendant again brought up the belt without prompting when another interviewing officer drove him back to his house.  These statements led the officers to identify the defendant as a potential person of interest.  Two days later, on April 20, 2005, the defendant agreed to a follow-up interview at the district attorney's office with Detective Lieutenant John Gibbons and Sergeant Gary Gadreault.  Unlike his first interview, this interview was recorded.

Later in the investigation, a deoxyribonucleic acid (DNA) profile was generated from the biological material found on the ligature with which Waryasz was strangled.  Analysis of the

profile revealed that it contained a mixture of DNA, and the defendant's DNA matched the major profile in the mixture. The defendant was also identified as a potential contributor to a mixture of DNA recovered from Waryasz's fingernails.

Before the defendant was indicted for the murders, he was incarcerated after an arrest on other charges. During this time, he made several incriminating statements to two fellow detainees. In a conversation with one such detainee, the defendant confessed to murdering Waryasz.

c.  The trial and consolidated appeal. On July 8, 2005, the defendant was indicted for the murders of Waryasz and her unborn child, as well as for armed robbery. The defendant's trial took place over the course of twelve days in May 2007. At trial, the defendant argued in part that the police investigation was inadequate and unduly focused on him as the perpetrator (Bowden defense). See Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980).

On May 25, 2007, a jury convicted the defendant of murder in the first degree for the killing of Waryasz, on theories of deliberate premeditation and felony-murder; murder in the first degree for the killing of Waryasz's unborn child, on a theory of felony-murder; and armed robbery. The defendant timely appealed. On August 31, 2018, the defendant filed his first motion for a new trial, which was remitted to the Superior

Court.  At the same time, the defendant filed a motion to amend the motion for a new trial at a later date, and a motion for funds for an audio analysis expert to analyze the audio recordings of the defendant's second interview with the police, both of which the court allowed.  On October 4, 2018, the defendant filed an amended motion for a new trial, raising three additional issues unrelated to the audio recordings.  Throughout 2019, the defendant filed further motions for funds for an audio analysis expert, which were granted each time.

On August 21, 2019, the defendant sought to amend his motion for a new trial a second time with an audio expert's analysis, which the Commonwealth moved to strike as unreasonably late.  On August 30, 2019, the judge granted the Commonwealth's motion to strike the supplement and denied the defendant's motion for a new trial in a written decision.  The defendant appealed from the decision, and that appeal was consolidated with the direct appeal from his convictions.

On July 17, 2023, we affirmed the murder convictions and the denial of the first motion for a new trial, and we vacated the armed robbery conviction as duplicative of the conviction of murder of Waryasz's unborn child.  See Bateman, 492 Mass. at 438 ("Except where a conviction of murder in the first degree is based on a theory in addition to a theory of felony-murder, a separate conviction of an underlying felony is duplicative of

the felony-murder conviction").  We also conducted plenary review of the record pursuant to G. L. c. 278, § 33E, and found no ground for relief.  Id.

d.  The second motion for a new trial.  On December 4, 2020, while the direct appeal was pending, the defendant filed a pro se second motion for a new trial, which we remitted to the Superior Court for consideration in the first instance.  He later amended the motion, represented by current counsel, asserting three claims.  First, the defendant argued that he was prejudiced by the Commonwealth's failure to timely disclose a segment of an audio recording of a police interview with a potential trial witness, which he viewed as exculpatory.  Second, the defendant argued that the expert analysis of the audio recordings of the defendant's interview with police constitutes newly discovered evidence, because it reveals anomalies indicating that the recordings are not authentic and have been manipulated.  Third, the defendant raised two ineffective assistance of counsel claims based on trial counsel's failure to interview or call two witnesses, who had made a U-turn at the gasoline station around the time of the murders and did not recall seeing the defendant's van.  The defendant also argued that his prior appellate counsel was ineffective for not arguing that trial counsel was ineffective for these reasons.

On April 18 and 19, 2024, the judge conducted an evidentiary hearing on whether the "anomalies" in the audio recording of the defendant's April 20, 2005, interview suggested that the recording was inaccurate or inauthentic.  On September 17, 2024, the judge issued a written decision denying the defendant's second motion for a new trial, rejecting all three arguments raised by the defendant.

On November 12, 2024, the defendant filed a gatekeeper petition in this court, pursuant to G. L. c. 278, § 33E, seeking leave to appeal from the denial of his second motion for a new trial.  A single justice took no action on the defendant's application because the defendant had filed the motion before the issuance of the rescript following our decision concerning his direct appeal.  See G. L. c. 278, § 33E.  Accordingly, the defendant timely appealed, and the defendant's appeal from the denial of his second motion for a new trial is before us pursuant to § 33E.[3]

---

[3] General Laws c. 278, § 33E, states, in pertinent part:

"In a capital case . . . the entry in the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence. . . .  After the entry of the appeal in a capital case and until the filing of the rescript by the supreme judicial court motions for a new trial shall be presented to that court and shall be dealt with by the full court . . ." (emphases added).

2.  Discussion.  a.  Scope and standard of review.  "'[A] motion for a new trial is addressed to the sound discretion of the trial judge,' who may grant a new trial 'if it appears that justice may not have been done.'"  Commonwealth v. Jacobs, 488 Mass. 597, 600 (2021), quoting Commonwealth v. Kolenovic, 471 Mass. 664, 672 (2015), S.C., 478 Mass. 189 (2017).  This court reviews "a judge's denial of a motion for a new trial to determine whether there was 'a significant error of law or other abuse of discretion,' according 'special deference to the action of a motion judge who was also the trial judge.'"  Commonwealth v. Morin, 478 Mass. 415, 424 (2017), quoting Commonwealth v. Grace, 397 Mass. 303, 307 (1986).  A judge's decision constitutes an abuse of discretion when it results from "a clear error of judgment in weighing the factors relevant to the decision such that the decision falls outside the range of reasonable alternatives" (citation omitted).  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).  "A trial judge is entitled to rely on [his] knowledge of what occurred at trial when ruling on a motion for a new trial."  Commonwealth v. Chatman, 466 Mass. 327, 333-334 (2013), S.C., 473 Mass. 840 (2016).

b.  Nondisclosure of exculpatory evidence.  The defendant first argues that the judge erred in denying his second motion for a new trial because the Commonwealth failed to produce an

exculpatory portion of an audio recording of a police interview with a witness.  The witness, Mark Whalen, spent time with the defendant on the day of the murders, and the Commonwealth identified Whalen as a potential trial witness.

We review the relevant background.  On April 26, 2005, ten days after the murders, investigators interviewed Whalen.  The interview was recorded and consisted of three segments:  (1) a fifty-one minute and fifty-nine second segment, during which the officers asked Whalen about what he did on the day of the murders and his interactions with the defendant; (2) a fourteen minute and forty-seven second segment, during which the officers noted "technical difficulties" with the recorder and composed a written statement summarizing what Whalen told them during the first segment; and (3) a forty-one minute and fifty-eight second segment, consisting of the reading aloud of the written statement.  The Commonwealth had disclosed the second and third audio segments and Whalen's written statement to the defense during pretrial discovery, but it had not disclosed the first audio segment.  The first audio segment was eventually taped over with an unrelated interview -- an error that went undiscovered until fifteen years after the trial in 2022.[4]

_____

[4] As the motion judge explained, "The [compact disc] which should have contained the initial segment of Whalen's audio recorded interview had been taped over with an unrelated

In the undisclosed audio segment, Whalen's account of the day of the murders shifted several times. Eventually, he described having two separate interactions with the defendant in Greenfield on April 16. The first occurred "sometime in the afternoon" when "it was light out" and the defendant, walking on the side of the road, flagged down a pickup truck driven by Wendy Miller in which Whalen was a passenger. The defendant got into the back of the truck, Whalen sold the defendant one hundred dollars' worth of crack cocaine, and Whalen noticed that the defendant had a lot of money in his wallet. Later that day, an acquaintance called Whalen and asked him to come to her apartment. When Whalen arrived at the apartment, the defendant was inside, and Whalen gave someone crack cocaine in exchange for one hundred dollars.

At one point during the interview, an officer told Whalen that the police had "reason to believe" the defendant brought a cash register up to the apartment. Indeed, three days before Whalen's interview, police officers had interviewed Greenfield resident Mollie Simanski. Simanski told police officers that Whalen had told her he had seen the defendant with a cash register on the day of the murders. However, throughout the

___

interview. In 2022, the prosecution, during a Zoom [online video conferencing platform] meeting with the defendant's expert and Massachusetts State Police Trooper [Sergeant] Gary Darling, found the missing audio recording in cloud storage."

undisclosed recording, whenever the investigating officers asked whether Whalen had seen the defendant with a cash register, Whalen repeatedly said, "No."

The defendant posits that the nondisclosure of the recording prejudiced him in three ways:  (1) Whalen's recorded statements about seeing the defendant in Greenfield in the "afternoon" during "daylight" would have put his counsel on notice that Whalen was a potential alibi witness; (2) the officers' repetitive questioning about whether Whalen saw the defendant with a cash register and failure to inquire into a possible alibi for the defendant would have supported the defendant's Bowden defense; and (3) the investigators' interrogation tactics could have been used to impeach other witnesses' testimony and undermine the credibility of the investigation generally.  Because the failure to disclose the recording was not prejudicial, we conclude that denying the defendant's motion for a new trial was not an abuse of discretion or other error.

"A defendant seeking a new trial based on undisclosed evidence has the burden to show that he or she was prejudiced by the nondisclosure." Commonwealth v. Imbert, 479 Mass. 575, 582 (2018).  The judge correctly found that the defendant specifically requested the undisclosed evidence during pretrial

discovery.[5]  The question then becomes whether "a 'substantial basis exists for claiming prejudice from the nondisclosure.'" Bateman, 492 Mass. at 419, quoting Commonwealth v. Lykus, 451 Mass. 310, 326 (2008).  "The defendant can meet his burden 'with record support for the conclusion that the jury would have been influenced by timely disclosure of the evidence in question.'" Imbert, supra, quoting Commonwealth v. Bly, 448 Mass. 473, 486 (2007).  "Put differently, we must decide whether there is a reasonable possibility that the nondisclosed evidence would have made a difference."  Imbert, supra, quoting Commonwealth v. Laguer, 448 Mass. 585, 594 (2007).[6]  In doing so, we "must consider the strength of the case against the defendant." Imbert, supra at 583, quoting Lykus, supra.  We consider in turn each type of prejudice claimed by the defendant.

    i.  Whether the defendant was prejudiced because the recording would have put his counsel on notice that Whalen could

_____

[5] The judge correctly concluded that because Whalen was identified as a potential trial witness, the Commonwealth was required by Mass. R. Crim. P. 14 (a) (1) (A) (vii), as amended, 444 Mass. 1501 (2005), to provide the defendant with all of Whalen's statements in its possession during pretrial discovery, and this requirement is "deemed a specific request for all 'statements of persons the party intends to call as witnesses.'" See Commonwealth v. Rodriguez-Nieves, 487 Mass. 171, 179 n.12 (2021), quoting Commonwealth v. Taylor, 469 Mass. 516, 521 (2014).

[6] The defendant must also "show that the undisclosed evidence existed and was exculpatory . . . [and] the prosecution failed to produce it."  See Bateman, 492 Mass. at 419.

serve as an alibi witness. The defendant first argues that he was prejudiced because with the benefit of the undisclosed recording, his trial counsel would have pursued Whalen as an alibi witness. The defendant argues that Whalen's undisclosed, recorded statements about when he first encountered the defendant on the day of the murders, in contrast to his written statement, indicate that Whalen could have testified that the defendant was in Greenfield, not Deerfield, at the time of the murders and thus provided an alibi.

This argument is unpersuasive. Whalen's statements in the undisclosed recording are essentially identical to his written statement, which was timely provided to the defense during pretrial discovery. In his written statement, Whalen said that he saw the defendant "in the afternoon during daylight," but he did not know at what time. On the undisclosed recording, Whalen stated that he first saw the defendant "sometime in the afternoon" when "it was light out." The only difference the defendant identifies between the undisclosed recording and Whalen's written statement is that on the recording, when the officers were inquiring about this encounter, Whalen also said, "the time was" -- at which point an interviewing officer asked another question before Whalen could complete his sentence. But this difference does little to strengthen Whalen's possible value as an alibi witness. Throughout the recording, Whalen

repeatedly claimed he did not remember numerous details about the day of the murders -- including at what time he stopped working for the day, the names of people with whom he spent time, and what the defendant was wearing. Any value Whalen might have had as an alibi witness was already evident from the written statement the Commonwealth timely disclosed to the defense. The undisclosed recording does not reveal anything material that would have changed trial counsel's decision about calling Whalen as a witness.

Further, the defendant failed to show prejudice because the evidence against him at trial was overwhelming. See Bateman, 492 Mass. at 438 (disagreeing with defendant's contention that evidence against him was "not overwhelming"); Imbert, 479 Mass. at 583. Such evidence included, among other things, that the defendant's DNA was the major profile in the genetic material on the ligature with which Waryasz was strangled and was consistent with DNA found under her fingernails; testimony from several witnesses who saw a van resembling the defendant's distinctive van at the gasoline station, including one who sold the defendant the paint used on the van, and placed the van at the station at the time of the murders; the defendant's detailed confession to a fellow inmate; the defendant's own inculpatory statements, including those he made to the police about the murder weapon before the means of the victims' deaths was made

public; and credible evidence that the defendant had no money before the murders but was seen with a lot of cash in the hours following the murders.  The defendant therefore has not shown prejudice on this ground.

ii.  <u>Whether the defendant was prejudiced because he could not use the recording to support his </u>Bowden<u> defense</u>.  The defendant next argues that he was prejudiced by the nondisclosure because the recording supports his <u>Bowden</u> defense that the investigation was inadequate.  Specifically, the defendant contends that the officers' repeated questioning about whether Whalen saw the defendant with a cash register, despite Whalen's denials, and their failure to probe Whalen further about when he first saw the defendant on the day of the murders, which could have provided the defendant with an alibi, suggest that the investigation was unduly focused on the defendant.

This argument is similarly unavailing.  As explained <u>supra</u>, throughout the undisclosed recording, Whalen asserted several times that he did not recall specific details about the day of the murders, and his timeline of the day's events changed.  Indeed, the officers asked Whalen "when" he first saw the defendant on April 16 and whether he could "pinpoint a time" for them, but when they did so, Whalen either did not respond or merely stated that the meeting occurred "sometime in the afternoon" when "it was light out."  If the officers' failure to

probe further into the exact time when Whalen first saw the defendant would have had any effect on the jury's perception of thoroughness of investigation, such effect would have been mitigated by these other statements -- which indicate that Whalen was unable to provide a more specific time. Additionally, using the recording to bolster the defendant's Bowden defense would have permitted the Commonwealth to "offer 'testimony about why the investigators chose the particular investigative path they did,' in order to rebut that defense." Commonwealth v. Wardsworth, 482 Mass. 454, 478 (2019), quoting Commonwealth v. Avila, 454 Mass. 744, 755 (2009). Thus, the Commonwealth could have explained to the jury that the officers repeatedly questioned Whalen about seeing the defendant with a cash register because they were following up on the statement from Simanski, an apparently disinterested witness, in which she claimed that Whalen told her multiple times that he had seen the defendant carrying a cash register. As the cash register was missing from the gasoline station when Waryasz's body was discovered, this statement would have been detrimental to the defendant.

Moreover, as stated supra, any effect the nondisclosure might have had on the defendant's Bowden defense would have been more than outweighed by the compelling evidence inculpating him.

The defendant therefore cannot show prejudice on this ground, either.

    iii.  <u>Whether the defendant was prejudiced because he could have used the recording to impeach trial witnesses and undermine the credibility of the investigation</u>.  Finally, the defendant argues that he was prejudiced because the undisclosed recording reveals that the officers impermissibly threatened Whalen and promised not to prosecute him for his drug crimes in order to coerce him into providing inculpatory information about the defendant.[7]  Even though Whalen did not testify at trial, the defendant suggests that he could have used the recording to impeach other trial witnesses and further undermine the credibility of the investigation.

    This argument, too, falls short.  The judge found, and we agree, that the officers' questioning style throughout the undisclosed recording was reasonable and does not cast doubt on the veracity of any witnesses' testimony or the investigation generally.  Whalen's account of the day of the murders changed throughout the course of the interview, and at times it contradicted what other witnesses, such as Simanski, had already told the officers.  The officers therefore had good reason to

---

[7] For example, the officers forcefully and repeatedly asked Whalen about the cash register, questioned whether he was telling the truth, and suggested that he would be charged with a crime if they discovered he was lying to them.

continue to press Whalen and to convey to him the importance of being truthful with them. In any case, to the extent anything in the interview could be construed as a threat or inducement to provide inculpatory information about the defendant, these efforts ultimately appear to have been unsuccessful. The officers pressed Whalen most on whether he had seen the defendant with a cash register on the day of the murders, but Whalen steadfastly denied that he had throughout the interview. For these reasons, and because the evidence against the defendant was overwhelming, we conclude that the defendant has not shown that he was prejudiced by the Commonwealth's failure to disclose the audio segment.[8]

c. "Newly" discovered evidence of anomalies in the recording of the defendant's interview. The defendant next argues that he is entitled to a new trial because his audio analysis experts, who analyzed the recordings of the defendant's second police interview and testified at the two-day evidentiary hearing on April 18 and 19, 2024, opined that these recordings

---

[8] The defendant also contends that Whalen's absence at trial was the result of police intimidation and thus a new trial is required. We are unpersuaded. As explained supra, the undisclosed recording does not reveal any impermissible police conduct. This claim otherwise rests purely on speculation, which is insufficient. See Commonwealth v. Laguer, 448 Mass. 585, 599 (2007) (finding defendant did not demonstrate substantial basis for claiming prejudice, where argument was based on "nothing more than speculation").

were allegedly intentionally edited or manipulated.  We recite here some additional facts relevant to the recorded interview and the experts' opinions.

i.  The defendant's April 20, 2005, interview with the police.  As Gadreault affirmed in an affidavit, he recorded the entirety of the defendant's second police interview on an Olympus digital electronic recorder (Olympus).  Gadreault stopped the recording when the defendant took a bathroom break, and he started it again when the defendant returned.  This caused there to be two recorded segments of the interview.  The defendant reviewed and signed a written summary confirming what he told police at the end of the interview.  Gadreault subsequently transferred the recordings from the Olympus to a computer and later downloaded the recordings to compact discs.  Gadreault attested that the recording accurately reflected the interview, he did not know how to edit the recording, he did not tamper with the recording, and he was unaware of anyone doing so.  The judge specifically credited his affidavit.

ii.  Expert testimony and reports.  Both the defendant's and the Commonwealth's experts conducted forensic analysis on the digital audio recordings from the Olympus used to record the interview.  The defendant utilized two experts, Lindsay Hawk and Marisa Déry.  Hawk identified numerous anomalies in the recording, including truncated or repeated words, changes in

waveform, and abrupt changes of topic and volume.  Hawk concluded that these anomalies were "consistent with redaction" and "possible active editing."  Similarly, Déry opined that the recording was "distorted and overloaded" and "poorly recorded"; the recording inexplicably did not have a visible ground hum; and some purportedly duplicate files had different file names and hash values, which indicated the files were not true duplicates of each other.  By contrast, the Commonwealth's expert, Dante Fazio, concluded that any supposed anomalies were "fairly standard" given the "noisy" and "reverberant" room in which the interview took place, and all features of the file were "consistent internally" and consistent to a sample recording taken from the same recorder.  Accordingly, Fazio concluded that the recordings contained no traces of edits or manipulation.

The defendant argues that his experts opined that the recorded interview was consistent with editing and manipulation, which therefore casts doubt on the authenticity of the recordings and the integrity of the police investigation.  To prevail on his claim that he is entitled thereby to a new trial, the defendant must show that "the evidence is in fact newly discovered; the newly discovered evidence is credible and material; and the newly discovered evidence casts real doubt on the justice of the conviction[s]" (citation and quotations

omitted).  Bateman, 492 Mass. at 437, quoting Commonwealth v. Teixeira, 486 Mass. 617, 640 (2021).  "Our review of a denial of a motion for a new trial based on newly discovered evidence is for abuse of discretion or other error of law."  Commonwealth v. Moore, 489 Mass. 735, 749 (2022).  Where, as here, the judge held an evidentiary hearing, the court "afford[s] deference to the motion judge's findings that are 'drawn partly or wholly from testimonial evidence' unless clearly erroneous."  Commonwealth v. Mercado, 495 Mass. 763, 766 (2025), quoting Commonwealth v. Tremblay, 480 Mass. 645, 655 (2018).

iii.  Whether the evidence is newly discovered.  Evidence is "newly discovered" where the evidence was "unknown to the defendant or his counsel and not reasonably discoverable by them at the time of trial (or at the time of the presentation of an earlier motion for a new trial)."  Grace, 397 Mass. at 306. Here, the judge concluded that the anomalies in the audio recordings were not newly discovered because "all of the tools, such as software and machines [that the defendant's experts, Hawk and Déry,] used to analyze the recordings" of the defendant's interview "were available between 2008 and 2013," well before the defendant filed his first motion for a new trial, on August 31, 2018.

We discern no abuse of discretion or other error.  Even assuming, as the judge did, that the defendant could not have

had the recordings analyzed before trial, this information about anomalies in the recordings was reasonably discoverable well before his first motion for a new trial in August 2018.  Hawk testified that "the idea of audio analysis is old" and that she used the most modern versions of existing software.  Although advancements in the field since 2007 have made it easier to detect anomalies, Hawk testified that detecting anomalies "is a matter of the expertise of the person who's employing the tool." Similarly, Déry testified that the tools she used were available in 2008, and that the most important tool is critical and careful listening.[9]

The defendant nevertheless argues that he raised this issue in his first motion for a new trial because he amended his motion by submitting an expert opinion but the judge refused to consider it.  This is inaccurate.  The defendant was permitted to amend his first motion for a new trial and was granted funds for an audio analysis expert in October 2018.  The defendant filed his amended motion for a new trial on October 4, 2018, adding three issues unrelated to the audio recordings.  The defendant continued to receive court-granted funds for the audio analysis experts through 2019.  The judge then conducted a two-

---

[9] The defendant asserts that "[t]he specific software used here, such as SpectraLayers, did not exist until 2012," but Hawk testified that she did not use SpectraLayers.

day evidentiary hearing on May 30 and May 31, 2019, on the first motion for a new trial. On August 21, 2019, three months after the evidentiary hearing, the defendant attempted to amend or supplement his motion for a new trial again, raising a claim of edited audio recordings for the first time, among other issues.[10] The Commonwealth filed a motion to strike the supplement as waived under Mass. R. Crim. P. 30 (c) (2), as appearing in 435 Mass. 1501 (2001),[11] arguing that the supplement raised a new issue three months after the evidentiary hearing and nearly one year after the motion for a new trial was filed, which the judge granted.[12] The judge did not abuse his discretion in granting the Commonwealth's motion to strike the second supplement. The defendant was afforded postconviction discovery and funds to explore the issue over the course of one year. Moreover, the defendant had amended his motion once in October 2018, and

---

[10] The supplement also stated that a more detailed supplementary report would be forthcoming the following month.

[11] Rule 30 (c) (2) of the Massachusetts Rules of Criminal Procedure, as appearing in 435 Mass. 1501 (2001), states: "All grounds for relief claimed by the defendant . . . shall be raised by the defendant in the original or amended motion. Any grounds not so raised are waived unless the judge in the exercise of discretion permits them to be raised in a subsequent motion, or unless such grounds could not reasonably have been raised in the original or amended motion."

[12] The judge granted the Commonwealth's motion in a footnote in his decision denying the defendant's first motion for a new trial for the reasons stated in the Commonwealth's motion.

further attempts to add issues were subject to the judge's discretion. See Mass. R. Crim. P. 30 (c) (2). The judge acted within his discretion in concluding that the supplement was filed unreasonably late and added issues not previously raised. See Commonwealth v. Crawford, 430 Mass. 683, 684 n.2 (2000). Thus, the defendant has not shown that the information concerning anomalies in the audio recordings was not reasonably discoverable at the time he filed his first motion for a new trial on August 31, 2018.

iv. Whether the evidence casts real doubt on the justice of the convictions. Even if the experts' opinions concerning anomalies in the audio recordings were newly discovered, however, the defendant has failed to show that that information casts real doubt on the justice of the convictions. The inquiry is "not whether the verdict[s] would have been different, but rather whether the new evidence would probably have been a real factor in the jury's deliberations." Grace, 397 Mass. at 306. Here, the judge concluded that the audio recordings had not been manipulated because "[n]o expert testified conclusively that portions of the taped interview had been destroyed or were missing, or that the recording did not reflect accurately and completely what had been said," and the defendant himself "does not assert that the audio recording is missing any specific or significant, much less exculpatory, statement that he may have

made."  The defendant maintains that, to the contrary, the experts opined that the recordings were "consistent with editing and manipulation" and that "[b]oth experts testified the recording had evidence it had been edited."  As a result, the defendant argues, this information raises doubts about the police investigation and the credibility of the Commonwealth's witnesses and thus this information would have been a real factor in the jury's deliberations.

The defendant overstates the experts' conclusions.  Both Hawk and Déry repeatedly explained that they could not conclude the recordings were edited; the presence of anomalies is not necessarily proof of editing; anomalies can indicate innocuous background noise, such as typing or a momentary increase in volume; and anomalies were present across all the witness interviews, not just the defendant's interview.  The experts attributed some of the anomalies to the fact that the recording was a duplicate, and therefore necessarily not original, because the interview was recorded on a handheld digital device and uploaded to a computer.  Both experts expressly concluded that although editing was a possible explanation for the anomalies, they could not rule out other causes.  Moreover, as the judge explained, the defendant did not describe what exculpatory or otherwise significant statements were missing from the audio

recordings.[13]  All of this, coupled with the overwhelming evidence of the defendant's guilt, discussed supra, shows that this evidence would not have been a real factor in the jury's deliberations.[14]  Accordingly, the experts' opinions do not cast real doubt on the justice of the convictions.[15]

d.  Ineffective assistance of counsel.  Finally, we address the defendant's argument that trial counsel was ineffective for failing to interview or call two witnesses to testify who made a U-turn at the gasoline station at around the time of the murders and did not recall seeing the defendant's van.  On the day of the murders, Allison and Kenneth Hamilton were driving to a restaurant for a dinner reservation.  They missed the turn for the restaurant, so they pulled into the gasoline station to make a U-turn.  Both Allison and Kenneth provided statements to the

---

[13] In a 2020 affidavit filed in the Superior Court, the defendant alleged that several specific words and phrases from the interview were omitted in the audio recording.  However, these omissions, which include, for example, details about where his van broke down on the day of the murders, are not material.

[14] Because the experts did not conclude that the recordings were edited, we reject the defendant's argument that the audio recordings were inadmissible because they could not be authenticated.

[15] The defendant separately argues that trial counsel was ineffective by failing to retain an audio expert to review the recordings before trial or the first motion for a new trial.  As explained supra, any failure to explore this issue was not prejudicial because the experts' testimony would not have produced anything material, and therefore counsel was not ineffective for failing to explore this issue earlier.

police.  Allison said that the clock in their car indicated that it was 6:30 P.M. when they turned around, and she was sure of the time because she was worried they would be late for their reservation.  She also noted that there was a shiny, red pickup truck in the gasoline station's parking lot.  She did not recall seeing a van in the parking lot, but she thought "[t]here may have been another vehicle parked parallel to the [gasoline station's] building . . . but it is hard to say for sure."  Kenneth told police he did not "remember any cars being in the lot, but [he] didn't look either."

We review "claims of ineffective assistance of counsel in cases of murder in the first degree for a substantial likelihood of a miscarriage of justice."  Commonwealth v. Moffat, 486 Mass. 193, 205 (2020).  "We [also] afford particular deference to a decision on a motion for a new trial based on claims of ineffective assistance where the motion judge was, as here, the trial judge."  Commonwealth v. Martin, 467 Mass. 291, 316 (2014).  In particular, the "[f]ailure to call a witness will not be considered ineffective assistance of counsel absent a showing of prejudice."  Commonwealth v. Vaughn, 471 Mass. 398, 413 (2015).

In this case, the Hamiltons made a quick U-turn at the gasoline station at around the time the victims were killed.  Kenneth did not look or pay attention to whether there were any

cars in the parking lot. Allison noticed a red pickup truck in the parking lot and did not recall seeing a van, but she told police that there may have been another vehicle parked parallel to the gasoline station's building. Allison's testimony would have been helpful to the defendant to the extent that she did not recall seeing the defendant's van in the parking lot at 6:30 P.M., which potentially casts doubt on another witness's testimony that he saw Waryasz, the defendant, and his van at approximately 6:30 P.M.[16,17] However, the failure to interview Allison or call her as a witness did not create a substantial likelihood of a miscarriage of justice. Five other witnesses testified that they saw a van matching the defendant's in the gasoline station's parking lot in the minutes before and at the

---

[16] Indeed, trial counsel told the court that Allison Hamilton would potentially testify. On the next day, however, trial counsel incorrectly told the defendant that all of the witnesses who were scheduled to testify had refused. In fact, in 2022, Allison Hamilton told a licensed private investigator hired by postconviction counsel that she had received paperwork directing her to go to the court house during the trial, but when she did so, nobody spoke with her and she was not asked to testify.

[17] In an affidavit in support of the defendant's second motion for a new trial, the defendant's former postconviction counsel explained that he believed Allison's statement was exculpatory because it impeached the testimony of Williams, who said he saw Waryasz, the defendant, and his van in the parking lot at approximately 6:30 P.M. Counsel nevertheless chose not to investigate her account because he was focused "on the issues raised in the new trial motion, which [he] felt were very strong."

time of the murders. Allison's testimony would not have directly contradicted the other witnesses' testimony because, consistent with her statement to police, she would have testified only that she did not recall seeing a van. See Commonwealth v. Gonzalez, 473 Mass. 415, 424 (2015). Particularly in light of the overwhelming evidence of the defendant's guilt, detailed supra, Allison's testimony would likely not have influenced the jury's verdicts.[18],[19]

3. Conclusion. For the foregoing reasons, we affirm the order denying the defendant's second motion for a new trial.

So ordered.

---

[18] Because trial counsel was not ineffective, prior appellate counsel was not ineffective for failing to argue that trial counsel was ineffective. See Breese v. Commonwealth, 415 Mass. 249, 252 (1993) ("If the defendant received effective assistance of counsel at trial, there can be no argument that either first or second appellate counsel was ineffective for failing to argue that trial counsel was ineffective").

[19] For substantially the same reasons as those discussed supra, we also reject the defendant's arguments that (1) the judge was required to hold evidentiary hearings regarding the undisclosed segment of the Whalen interview and the Hamiltons' statements, see Mass. R. Crim. P. 30 (c) (3) ("The judge may rule on the . . . issues presented by [a motion for a new trial] . . . without further hearing if no substantial issue is raised by the motion or affidavits); and (2) the defendant was prejudiced by the cumulative effect of any errors.